[No. B186698. Second Dist., Div. Seven. Sept. 21, 2006.]

JOHN WARREN, Plaintiff and Respondent, v.
HILDEGARD MERRILL, Defendant and Appellant.

98

**COUNSEL**

Roger James Agajanian for Defendant and Appellant.

James C. Fedalen for Plaintiff and Respondent.

**OPINION**

**JOHNSON, J.**—The buyer of a condominium brought an action against his real estate agent seeking to quiet title and other relief. The agent had promised the buyer (who supplied the down payment) his name would be placed on the title once the loan in the agent's daughter's name funded and

escrow closed. However, the agent did not honor her promise as her undisclosed intent was to keep the condominium as an investment. The trial court found the agent had acquired the condominium through fraud, had made material misrepresentations, and had breached her fiduciary duties to the buyer. The court quieted title to the unit in favor of the buyer, imposed a constructive trust on the property in favor of the buyer and awarded the buyer $15,000 in noneconomic damages on his fraud, breach of fiduciary duty and ejectment causes of action. The court also awarded the buyer $50,000 in punitive damages offset by amounts the agent had paid to keep various obligations current. The agent appeals to challenge the court's findings of fact and to present numerous legal defenses to the court's conclusions of law. We find the agent's arguments and contentions do not withstand scrutiny. We accordingly affirm.

## FACTS AND PROCEEDINGS BELOW

In July 2001 plaintiff and respondent, John Warren, had all sorts of problems. He suffered from Tourette's syndrome and other related neurological disorders affecting his short-term memory and cognitive abilities. His movie set rental business was not doing well. At the time he was also in the process of getting divorced. He wanted to buy a house for himself. He attended an open house for a condominium in Woodland Hills near the Warner Center Apartments where he was then living. At the open house Warren met defendant and appellant Hildegard Merrill, doing business as Calabasas Realty, who was the agent for the seller of the condominium. Merrill told Warren the condominium was a good buy. She told him the seller was motivated to sell, the condominium had the largest square footage of any of the townhouses in Woodland Hills and would make a good investment.

Merrill is very experienced in the real estate field. She acquired her real estate license in 1967 and had been a licensed real estate broker since 1981. She had bought and sold so many condominiums over the years she sometimes referred to herself by her professional nickname of the "condo queen." In due course Merrill also acquired a mortgage broker's license.

With his permission Merrill ordered a credit report for Warren. Although his personal credit was fine, a studio set business in which he had been a partner had sustained a $1 million judgment for nonpayment of rent when the business collapsed. As a result, Warren's credit rating was poor and his FICO score was very low. Merrill told Warren he would have to make at least a 20 percent down payment or he would have to pay a very high mortgage interest rate. Although Merrill denied it at trial, Warren testified he informed Merrill he only had $50,000 to put toward a down payment until his family residence was sold as part of the divorce proceedings.

Merrill told Warren he needed a coborrower with a good credit rating in order to secure a mortgage at a reasonable rate. Warren told Merrill he knew of no one who could be a coborrower with him. Merrill suggested her own daughter, Charmaine Merrill, for this purpose. Warren indicated he was interested in pursuing this arrangement and Merrill told Warren she would discuss it with her daughter.

A day or so later Merrill told Warren her daughter Charmaine had agreed to go on title with him and to be the coborrower on the mortgage provided he pay Charmaine $10,000 for her assistance. Warren testified Merrill explained her plan for the transaction as follows: Charmaine would be the co-owner and coborrower on the loan. However, once escrow closed Charmaine would execute a quitclaim deed to him to remove her name from title in exchange for the $10,000.

As the loan broker Merrill knew it was important to make a 20 percent down payment in order to secure a reasonable interest rate. Because Warren did not have the money Merrill offered to defer her commissions of $27,000 and to loan this amount to Warren in order to attain a 20 percent down payment of $77,000.

Warren agreed to Merrill's plan. The parties discussed committing their arrangement to written form but never did. According to Warren he asked Merrill several times, both before and after escrow closed, to put their agreement to transfer title in writing.

Merrill wrote up a purchase offer for the condominium. The purchase offer indicated her daughter Charmaine and Warren were the proposed co-purchasers. Merrill never had Warren fill out a loan application form and Merrill never attempted to secure a loan with Warren as a coborrower with her daughter Charmaine. Instead Merrill applied for and secured a loan in Charmaine's name alone.

Through Charmaine's and Merrill's testimony it became apparent Merrill misrepresented the facts when she filled out Charmaine's loan application. For example, Merrill stated the source of the proposed $77,000 down payment was a combination of savings and gifts. The application stated Charmaine then resided in a condominium at 5800 Kanan Road in Agoura Hills, conducted catering and shuttle businesses out of the residence on Kanan Road, and had been doing so since 2001, earning a monthly income of $7,500 from those businesses. In reality, Charmaine had resided for years in Aspen, Colorado, and had never lived at or conducted a business out of the 5800 Kanan Road residence. Also, the businesses Charmaine purportedly

conducted had shut down sometime in 1990. Charmaine was instead employed as a waitress in Aspen, Colorado, and periodically conducted her shuttle business there. She otherwise relied on her mother for support. Although Merrill indicated on the loan application Charmaine intended the condominium to be her primary residence, the parties' plan all along was for Warren to live in the condominium instead. As Merrill later conceded in her testimony, she would never have gotten the loan had she been truthful in the loan application.[1]

Charmaine was not involved in any part of the transaction other than to sign the documents her mother told her to sign. She had never met or talked to Warren and by the time of trial had never even seen the interior of the condominium. Charmaine stated Merrill supported her and she trusted her mother and her mother's judgment implicitly. Charmaine testified she never questioned or concerned herself with her mother's investment decisions.

As with most of the evidence, how the $77,000 down payment was cobbled together was the subject of conflicting evidence. According to Warren, he paid the entire $77,000 down payment: $50,000 into escrow by writing checks to different persons and entities as directed by Merrill and by repaying the $27,000 Merrill loaned him toward the down payment. Specifically, Warren testified he and Charmaine each deposited a check for $10,000 into escrow. Then at Merrill's direction, he repaid Charmaine this $10,000 by writing two checks of approximately $5,000 each: one to pay toward Charmaine's Chase Platinum credit card balance and the other to pay toward Charmaine's MBNA credit card balance.

Warren wrote a check for $30,000 to Merrill's boyfriend, again at Merrill's direction. Merrill then deposited into escrow a check for $30,000 written on her and her boyfriend's Paine Webber investment account. In exchange for her boyfriend's services, Merrill had Warren write her boyfriend another check for $2,000.

Merrill deferred her combined sales commission and loan broker commission of $27,000 to complete the $77,000 down payment. Warren wrote Merrill a check for $27,000 which Merrill held uncashed until Warren repaid her this amount. He accomplished repayment of the $27,000 by writing

---

[1] The trial court was so alarmed by Merrill's testimony and her apparent lack of concern about admitting she had committed a form of fraud on the lender, the court recessed the proceedings to permit Merrill to consult with counsel regarding her Fifth Amendment right not to incriminate herself. After the recess Merrill indicated she wished to proceed. On the advice of her counsel Merrill believed she had not committed any truly fraudulent act and for this reason stated she had no concerns she might be incriminating herself.

Merrill checks of between $3,000 and $4,000 over the course of about six months. Unbeknownst to Warren, the seller had agreed to credit $6,000 in escrow to defray closing costs, which should have reduced the amount Warren repaid Merrill.

Merrill knew the lender would not fund the loan request with different people proposed to hold legal title than had applied for the loan. Merrill had Warren sign an amendment in escrow to remove his name from title, explaining the document was just a formality required to secure the loan and to close escrow. The amendment stated title would vest solely in Charmaine Merrill. The amendment further stated "John Warren is no longer a party to this escrow. All monies currently on deposit to this date shall accrue to Charmaine Merrill. . . ."

Escrow closed in October 2001 and Warren moved into the condominium. Merrill did not have Charmaine execute a quitclaim deed to transfer title to Warren after escrow closed or at any time thereafter.

Warren and/or his attorney made the mortgage payments directly to the lender for several months. However, Warren developed substance abuse problems. He checked into the Betty Ford Center for treatment. He had not made arrangements for someone to handle his personal and financial affairs in his absence. Previously the State of California had provided him with a personal assistant to see to his personal needs and this person had previously been the one to deal with his mail and to pay his bills.

Merrill learned the homeowners' association was about to foreclose on Warren's unit. A few days before the scheduled foreclosure date Merrill paid the association the approximately $5,000 then claimed as arrearages to prevent the foreclosure.

Warren also defaulted on his mortgage payments while in treatment. Merrill filed an unlawful detainer action to have him removed from the unit. The unlawful detainer complaint prepared by Merrill alleged Charmaine was the owner of the condominium. The complaint further alleged Warren occupied the condominium under a land sale contract and this agreement permitted him to occupy the unit so long as he made monthly payments of $2,500.

While Warren was still in the Betty Ford Center receiving treatment Merrill secured a judgment against Warren, got a writ of possession and evicted him from the premises. She removed all his belongings and either placed them in

a storage facility or in the garage of her home in Woodland Hills.[2] According to Warren, his belongings included original artwork, sports memorabilia, the personal papers of his grandfather, the former California Governor and Chief Justice of the United States, Earl Warren, antique furniture, jewelry, medals, and several filing cabinets containing all his business records.

When he left the Betty Ford Center in September 2002 Warren discovered he had been locked out of the condominium. He called Merrill from San Diego and offered to repay her all the money she had advanced to save the condominium from foreclosure. Warren explained he would request an advance on his inheritance from his brother who was the executor of their parents' estates. He talked to Merrill many times but she would not permit him to return to the residence. He did not understand how or why she could remove him from his own residence, or how or why she knew about the homeowners' association arrearages when he was not even aware of the requirement of homeowners' association dues. In his last conversation with Merrill, Warren explained he was desperate and homeless. Over a four-month period he had stayed with various friends or slept in his car, but was then sleeping in the park and using public facilities to attend to his personal hygiene. Merrill told Warren he just "didn't get it." Merrill informed Warren he did not owe her any money and directed Warren not to call her any more. After evicting Warren, Merrill rented the condominium to a series of renters.

At trial, Warren agreed he would have lost the condominium through foreclosure had he been the sole person on the title and trust deed absent extraordinary intervention by his brother who controlled additional funds as the executor of their parents' estates.

In her testimony Merrill acknowledged Warren paid the initial $10,000 into escrow. She also admitted she had held his $27,000 check until he repaid her this amount representing her loan to him of her commissions as the sales agent and loan broker. However, Merrill denied knowing anything about the $30,000 check Warren wrote to her boyfriend. On the other hand, Merrill admitted she recognized the endorsement on the back of Warren's $30,000 check as her boyfriend's signature. Merrill also denied knowing Warren had written her boyfriend a check for $2,000. She stated she had no idea why Warren would do such a thing, but acknowledged her handwriting appeared on the upper portion of the $2,000 check. She also acknowledged the endorsement on the check was her boyfriend's signature. Merrill denied knowing Warren had written any checks to Charmaine's credit card accounts and further denied knowing whether credit card accounts identified on Warren's checks even belonged to her daughter. Merrill claimed she paid the

---

[2] There was some indication in the evidence Merrill held a lien sale of Warren's personal property and was herself the successful bidder at the sale.

$30,000 plus out of her Paine Webber account toward the down payment as a gift to her daughter Charmaine.

Merrill explained her arrangement with Warren in varying terms. She claimed they had an equity sharing agreement. As she explained it, he was to make lease payments covering the mortgage and all related expenses for a year. At the end of the year he was to refinance the loan and Merrill would arrange to have Charmaine's name taken off title. Although she alleged in her unlawful detainer complaint they had a land sale contract, Merrill claimed this was a mistake. She denied they had agreed to anything more than a lease arrangement which might have evolved into a land sale contract if he had made all "option" payments in a timely fashion and was later able to refinance the loan. Later in her testimony Merrill described her arrangement with Warren as a sort of partnership, with Charmaine lending her credit and Warren making all the payments. However, because Warren defaulted on his payments within the first year, Merrill testified, he had forfeited all monies he had put into the deal.

As Merrill conceded in her testimony, when she undertook to represent Warren in the real estate transaction she owed him a fiduciary duty which required her to place his interests above her own. However, Merrill testified she saw no conflict of interest from her simultaneous representation of the seller, Warren and her daughter in the various transactions.

Warren filed a verified complaint against Merrill, Charmaine and others asserting 14 causes of action. Merrill and Charmaine filed a verified answer and asserted numerous affirmative defenses. Trial was to the bench. At the conclusion of the evidence and closing arguments the court ruled as follows: "With respect to the cause of action for quiet title, first cause of action, and the eighth cause of action for a constructive trust, the court finds in favor of the plaintiff. The court finds that the plaintiff has satisfied the elements of each and every one of those causes of action.

"As to both Mrs. Hildegard Merrill and Ms. Charmaine Merrill, I wanted to make some comments with respect to my view of the evidence and the element of the procurement by fraud and breach of the fiduciary duty. [¶] One of the problems I've had in evaluating the testimony, particularly of Ms. Hildegard Merrill, is that it's absolutely unreliable and lacks credibility. She has at various times described the transaction as a land sale contract, as a lease option, as a joint venture, as it may have suited her flexible purposes in the particular context in which the statements were made.

"She created for her daughter a loan application that, oh, to say mildly, puffed up the truth. But beyond that, her manner and demeanor and her attitude toward the statements were: Did she live there? No, but she could have lived there. It's one admission and avoidance after another.

"She also failed to disclose that she was a real party in interest in this matter, and I think that's just an incredible breach of fiduciary duty.

"And I entirely disbelieve her testimony that she has no idea how come Mr. Warren paid American Express [sic] and the MBNA cards of her daughter. She just simply doesn't know that. And she also doesn't know why Mr. Warren would have paid Mr. Lincoln Tate the two checks that were made out to him. That, to me, is totally beyond credibility based on the testimony that I have heard.

"And when I put all those circumstances together, what it appears to me is that she obtained from Mr. Warren the full 20 percent down payment, either by direct reimbursements or by causing him to make the full 20 percent down payment by paying to other people who were close to her and causing Mr. Warren, at her direction, to make those payments.

"When all is said and done, the reality of the transaction was that Mrs. Hildegard Merrill made it possible for Mr. Warren to buy the condominium under circumstances where she made $10,000 for her daughter and she collected $27,000 in commissions for herself. And the most that can be said for her alleged generosity is basically that she lent him her commission to help him out with the down payment and he repaid it in big, big chunks of [$3,000]- and $4,000 as soon as possible in a rather timely manner. So—and in addition to that, she had him write a check for $27,000, which she herself referred to during her testimony in court as a note. And I think her own testimony lends credibility to Mr. Warren's version of the facts, which is yes, she lent him the $27,000. He was going to pay it, and in fact, he did.

"With respect to the characterization of the transaction, I must say that the circumstances, as I see them—of course, I wasn't there and I'm totally human and therefore fallible—but from the evidence, as I understand it, and the reasonable conclusions that can be drawn from it, I don't understand the alternative explanation, or at least I'm not persuaded by it, that this was going to be a joint venture, because why would I make my daughter Charmaine jeopardize her credit for a period of 30 years. According to Ms. Hildegard Merrill's own testimony that the way she structured the transaction was that within a year Mr. Warren was to, quote, clean up his credit and take my daughter out and reimburse her in an uncertain proportion, at least nothing specific enough, for her equity. [¶] . . . [¶]

"The logical explanation is that at the time, she made $10,000 for her daughter, she earned a $27,000 commission. She got to represent both sides, so she could earn the full commission on the real estate. She was able to close the transaction within the time frame of her agency, whatever that was. And she was able to get a second commission on the mortgage, on the loan, which is, again, nothing wrong with that, but it hardly represents a fiduciary interest in Mr. Warren's well-being absent a conflict.

"But all of that would be less important to me other than my final conclusion from the evidence, which is that I believe that a promise was made to Mr. Warren, and I hold him responsible for knowing what he was signing when he signed [the escrow amendment removing his name from title], I have no problem with that, but I am persuaded by the testimony that clearly a promise was made to him that after the close of escrow he would be on title. And I do believe that based on the subsequent conduct and the totality of the circumstances, that there was no intention to do that at all, and in fact, it wasn't done, and that forms—so I'm not articulating every basis for my findings in favor of the plaintiff in these two causes of action, but I'm basing that on the totality of the evidence, but I simply want to highlight that I'm making a finding of fact that it has been established that part of the agreement was that he would be put on title at the conclusion of—after closing of escrow. . . ."

The court subsequently found by clear and convincing evidence Merrill had acted outrageously and with at least reckless disregard in perpetrating the fraud on Warren sufficient to warrant an award of punitive damages.

The court entered judgment quieting title in favor of Warren. The court imposed a constructive trust on the property and ordered Merrill and Charmaine as constructive trustees to convey the property to Warren forthwith. The court awarded Warren noneconomic damages in the amount of $15,000 on his causes of action for fraud, breach of fiduciary duty and ejectment. Regarding the fraud and breach of fiduciary duty causes of action, the court also awarded Warren $50,000 in punitive damages against Merrill. Pursuant to the parties' stipulation Merrill received credits against these damage awards of $18,765 to reimburse her for storage and related expenses and $32,000 to reimburse her for mortgage, taxes, homeowners' association dues and other payments she made with regard to the condominium. In another stipulation, Merrill agreed to return all of Warren's personal property and in exchange Warren agreed to dismiss his causes of action for conversion, for return of his personal property, and for an injunction. The court found in favor of Charmaine and Merrill on Warren's causes of action for intentional infliction of emotional distress and conspiracy. The court found in favor of

Charmaine on all causes of action against her, except, as noted, the causes of action to quiet title and to impose a constructive trust.

Merrill appeals from the adverse judgment.[3]

## DISCUSSION

Merrill claims the court's judgment is contrary to law and equity and is unsupported by the evidence. She asserts quieting title in Warren, while leaving Charmaine as the borrower on the loan, was erroneous because (1) Warren had neither legal nor equitable title because he "withdrew" from escrow; (2) because Warren "withdrew" from the escrow she owed him no fiduciary duty and therefore there could be no breach and no fraud; (3) Warren's illegal scheme to defraud the lender made him guilty of unclean hands, which bars relief; (4) Warren failed to prove the existence of a contract, and if he did, it was an illegal oral contract and thus void; (5) the lack of a written land sale contract violated the statute of frauds; and (6) Warren did not prevail on any of his causes of action against Charmaine and thus it is unjust for her to remain on the loan. Merrill also claims the award of punitive damages was erroneous because Warren suffered no actual damages as he defaulted on the mortgage payments, lived rent free and would have lost the property entirely but for her actions in saving the property from foreclosure by paying all arrearages.

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S FINDING MERRILL BREACHED HER FIDUCIARY DUTY TO WARREN BY PROCURING TITLE TO THE CONDOMINIUM THROUGH FRAUD.

There should be no dispute Merrill owed a fiduciary duty to Warren once she undertook to represent him in the real estate transaction. Merrill herself

---

[3] The court apparently awarded Warren costs and attorney fees although these postjudgment matters are not part of the record on appeal and were not included in Merrill's notice of appeal.

Charmaine did not appeal from the judgment. The court found in her favor on all of Warren's causes of action except his causes of action to quiet title and to impose a constructive trust. "As a general rule, where only one of several parties appeals from a judgment, the appeal includes only that portion of the judgment adverse to the appealing party's interest, and the judgment is considered final as to the nonappealing parties." (*Estate of McDill* (1975) 14 Cal.3d 831, 840 [122 Cal.Rptr. 754, 537 P.2d 874].) The exception to this general rule is where the part of the judgment appealed from is so interwoven and connected with the remainder on appeal the court must consider the whole case; and if a reversal is ordered it should extend to the entire judgment as deemed necessary to accomplish justice. (*Ibid.*) In this case the issues are sufficiently connected and intertwined. Thus, if we were to reverse the judgment we would reverse as to Charmaine as well.

acknowledged at trial she held a fiduciary position of trust toward Warren. Because she owed Warren a fiduciary duty Merrill further acknowledged she was required to place his interests above her own in the real estate transaction. Nevertheless, she claims there was no evidence of misrepresentation, no evidence of fraud and no evidence of a breach of her fiduciary duties to sustain the court's judgment. She claims this is true because whatever fiduciary duties she owed Warren terminated when he "withdrew" from the escrow.

When faced with a challenge to the sufficiency of the evidence to support a judgment, an appellate court, "indulge[s] in every reasonable inference to uphold the verdict if possible and defer[s] to the [trier of fact's] assessment of the credibility of the witnesses. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 359, p. 408.) '[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact].' (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)"[4]

We review the court's factual findings with these standards in mind.

■ " ' "The law of California impose[s] on . . . the real estate agent . . . the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his [or her] beneficiary. Violation of his [or her] trust is subject to the same punitory consequences that are provided for a disloyal or recreant trustee. (*King v. Wise,* [(1872)] 43 Cal. 628.)" (*Langford v. Thomas,* [(1926)] 200 Cal. 192, 196 [252 P. 602].) Such an agent is charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]' "[5]

■ A constructive fraud arises on a breach of duty by one in a fiduciary relationship who misleads another to his prejudice.[6] ■ Actual fraud occurs, when, among other circumstances, a person makes a promise

---

[4] *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 889 [93 Cal.Rptr.2d 364].

[5] *Buckley v. Savage* (1960) 184 Cal.App.2d 18, 27 [7 Cal.Rptr. 328] (real estate agent's failure to disclose he was purchasing the property for himself provided grounds to suspend/revoke his real estate license); Civil Code section 2322, subdivision (c) (the authority of an agent does not extend to violations of his or her fiduciary duties); see also Business and Professions Code section 10176 (listing grounds to suspend or revoke a real estate license, including making substantial misrepresentations and making "false promises of a character likely to influence, persuade or induce." (Bus. & Prof. Code, § 10176, subds. (a) & (b).)).

[6] Civil Code section 1573; *Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 129 [54 Cal.Rptr. 533].

without the intention of performing it.[7] To prove a cause of action for actual fraud requires evidence of " '(1) representation; (2) falsity; (3) knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damage (causation).' "[8]

█ The record in the present case contains substantial evidence satisfying each of the elements of both constructive and actual fraud. The evidence showed Merrill breached her fiduciary duties toward Warren and committed fraud by deliberately and falsely promising him she would place his name on title to the condominium if he went along with her plan on how to structure the transaction. From the beginning of the transaction she did not intend to perform her promise of placing his name on title. Merrill instead intended to procure the condominium for herself but did not disclose her role as a principal in the transaction. Merrill in fact kept the condominium and in so doing retained Warren's $77,000 down payment. She alternatively claimed he had gifted this money to her daughter Charmaine when he signed the amendment removing his name from title or had forfeited it by defaulting on the homeowners' association dues and mortgage payments.

Specifically, Merrill told Warren he needed a coborrower in order to finance his purchase of the condominium. Merrill offered her own daughter for this purpose. Merrill promised Warren that Charmaine would quit claim title to him as soon as the loan funded and escrow closed. However, Merrill's intent not to perform was apparent from the outset as she pursued her plan to use Warren's funds but keep the condominium for herself. Merrill never had Warren submit a loan application, either as an individual or as a coborrower with Charmaine. As an experienced real estate agent, real estate broker and loan broker, Merrill knew a lender would not permit Warren to be on title if he was not also responsible for the loan. However, Merrill filed a loan application in Charmaine's name alone.

Warren paid the initial $10,000 into escrow. Merrill had him make all subsequent payments representing his $77,000 down payment not into escrow, but instead to persons/entities within her control. If this was a legitimate transaction writing checks to third parties would have been wholly unnecessary. However for Merrill's purposes it made it appear, at least superficially, she, and not Warren, had contributed the $30,000 check into escrow, Charmaine had contributed $10,000 into escrow and she had deferred

---

[7] Civil Code section 1572, subdivision 4.

[8] *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 [17 Cal.Rptr.3d 26], quoting 5 Witkin, California Procedure (4th ed. 1997) Pleading, section 668, page 123.

her earned commissions of $27,000 as a credit into escrow (while holding Warren responsible for repayment).

Merrill led Warren to believe he had to sign the amendment in escrow removing his name from the title and gifting his contributions to Charmaine in order to secure financing. Warren obviously trusted Merrill's representation because he signed the amendment. However, after escrow closed Merrill did not, and never intended to, place Warren's name on title as promised. Through these deceptive maneuvers Merrill secured for herself an investment property in her daughter's name by lying to her principal and misappropriating his funds.

In these circumstances it seems preposterous to argue, as does Merrill, Warren "withdrew" from escrow and for this reason she owed him no fiduciary duty and thus could not be guilty of fraud. Instead, it may be more accurate to say Warren was "coerced" into signing the amendment and into "withdrawing" from escrow based on Merrill's representations the loan would not fund and the whole deal would fall apart unless he signed the amendment taking his name off title. If Warren truly "withdrew" from the escrow then all of the money he had contributed to the down payment should have been returned. It was not.

In sum, we agree with the trial court the evidence in this case was more than sufficient to show an egregious violation of the duties of loyalty and undivided interest by a fiduciary toward her principal, as well as a deliberate plan to defraud him out of his down payment and the property.

## II. THE COURT'S JUDGMENT QUIETING TITLE IN WARREN AND IMPOSING A CONSTRUCTIVE TRUST WERE PROPER REMEDIES IN LIGHT OF MERRILL'S FRAUD AND BREACH OF FIDUCIARY DUTY.

Merrill claims the court's judgment quieting title in Warren is erroneous for any number of reasons. She argues Warren did not state a cause of action to quiet title because a person holding equitable title cannot prevail as against the person holding legal title;[9] proof of a contract is a prerequisite to an

---

[9] Citing *G. R. Holcomb Estate Co. v. Burke* (1935) 4 Cal.2d 289, 297–299 [48 P.2d 669] (in a case devoid of any suggestion of fraud, the plaintiff holder of equitable title could not state a cause of action against the holder of legal title where the legal title holder had used her own funds to pay for the properties decades before and neither her title nor possession had ever been challenged for all those years).

action to quiet title and none was proved;[10] assuming the evidence showed an oral contract, Warren cannot prevail because he was in default under the contract[11] and the oral contract for land violated the statute of frauds;[12] and Warren failed to establish superior title to be entitled to have title quieted in his favor.[13]

Many of Merrill's arguments could have merit if this case involved a straightforward real estate transaction and not the acquisition of real property by a fiduciary as the result of committing a fraud on her client. For example, if this was a standard contract action then the fact Warren defaulted on his payments may indeed have presented a material impediment to his recovery. But this is not such a case. Indeed, this case did not even allege a contract cause of action. This was instead an action in equity to redress a fiduciary's actual and constructive fraud. As found in the previous part, substantial evidence supports the trial court's finding Merrill abused her trust and breached her fiduciary duties to Warren when she procured legal title to the condominium by making a false promise and duping him out of monies he put toward the down payment for the condominium. Thus, because the factual situation is not as Merrill suggests in her arguments, many of her contentions are either inapplicable or do not withstand scrutiny.[14]

What Merrill's arguments overlook are the following principles of law: Once fraud by a fiduciary is shown by the evidence (1) a written contract for a real property transaction is not required; (2) the absence of a written contract does not violate the statute of frauds; (3) the defrauded person may be found to hold superior title to that held by the defrauder; and (4) a wide variety of equitable remedies are available and appropriate to remedy the fiduciary's fraud.

---

[10] Citing *Roth v. Malson* (1998) 67 Cal.App.4th 552, 557 [79 Cal.Rptr.2d 226] (holding proof of a contract is a necessary element in any action for specific performance or for damages for breach of contract). We fail to see how this argument, or any other regarding contract actions, applies because the present case did not have a breach of contract cause of action, did not request specific performance, or request damages for breach of contract.

[11] Citing Civil Code section 1439 ("Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party, except [when performance is excused].").

[12] Civil Code section 1624, subdivision (a)(3) (an agreement for the sale of real property is invalid unless it is in writing and signed by the person [or the person's agent] to be charged).

[13] Citing *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 918 [69 Cal.Rptr. 612, 442 P.2d 692] (in a quiet title action a plaintiff can prevail only by proving his or her title is superior to that of the defendant's).

[14] Before the trial even started the court commented on the parties' divergent views of the case. After opening arguments the court told counsel, "Now one of you is in the Arctic and the other one is in the Antarctic and God knows where the truth lies, but the two of you are operating in very different universes and one has nothing to do with the other. . . ."

■ Many of these principles were explained by the Supreme Court in *Mazzera v. Wolf*.[15] "A constructive trust may be imposed when a party has acquired property to which he is not justly entitled, if it was obtained by actual fraud, mistake or the like, or by constructive fraud through the violation of some fiduciary or confidential relationship. [Citations.] Such a trust, imposed upon a partner, agent, or other fiduciary, arises by operation of law, and, accordingly, the statute of frauds is no bar. [Citations.] But the mere failure to perform an oral promise to convey real property is not itself fraud, and the agreement will be held unenforceable under the statute of frauds in the absence of actual or constructive fraud. [Citations.]"[16]

In this case the very fraud perpetrated *was* Merrill's oral promise to convey without the intent to perform the promise in order to induce Warren to part with his money. In this situation a constructive trust arose by operation of law and the statute of frauds presented no bar.[17]

■ Moreover, given the fraud Merrill perpetrated on Warren, equitable estoppel would preclude her from relying on a statute of frauds defense if it was applicable, which it is not. "The doctrine of estoppel to assert the statute of frauds has been consistently applied by the courts of this state to prevent fraud that would result from refusal to enforce oral contracts in certain circumstances. Such fraud may inhere in the unconscionable injury that would result from denying enforcement of the contract after one party has been induced by the other seriously to change his position in reliance on the contract. . . ."[18]

In addition, Warren's part performance of the oral contract by paying $77,000 for the down payment on the condominium would satisfy the statute of frauds in any event.[19]

■ On the other hand, Merrill correctly notes that as a general matter an action to quiet title cannot be maintained by the owner of equitable title as against the holder of legal title.[20] However, because of her fraud Merrill

---

[15] *Mazzera v. Wolf* (1947) 30 Cal.2d 531 [183 P.2d 649].

[16] *Mazzera v. Wolf, supra,* 30 Cal.2d 531, 535.

[17] *Mazzera v. Wolf, supra,* 30 Cal.2d 531, 535.

[18] *Monarco v. Lo Greco* (1950) 35 Cal.2d 621, 623 [220 P.2d 737].

[19] *Byrne v. Laura* (1997) 52 Cal.App.4th 1054, 1072 [60 Cal.Rptr.2d 908] ("The doctrines of part performance and equitable estoppel are, in any event, separate grounds for avoiding a statute of frauds.").

[20] See, e.g., *G. R. Holcomb Estate Co. v. Burke, supra,* 4 Cal.2d 289, 297–299 (in a case devoid of any suggestion of fraud, the holder of equitable title could not state a cause of action against the holder of legal title where the legal titleholder had used her own funds to pay for the properties decades before and neither her title nor possession had ever been challenged);

through Charmaine acquired only bare legal title which she held as constructive trustee for Warren, who, based on the equities, held superior title.[21]

■ Finally, when legal title has been acquired through fraud any number of remedies are available and appropriate. These remedies include quieting title in the defrauded equitable title holder's name and making the legal title holder the constructive trustee of the property for the benefit of the defrauded equitable titleholder.[22] "[W]here, as here, the facts upon which plaintiff's claim is based, are alleged, there is authority to grant any proper relief [within the strictures of the Code of Civil Procedure]. And appropriate remedies, such as cancellation, reconveyance, or decrees quieting title, or establishing or enforcing trusts, or determining the priorities of opposing equities, may be had, as between proper parties under our system, whenever they are required upon equitable considerations and are justified by the pleadings and proof in the case. [Citations.]"[23]

In light of these authorities, and given the evidence of actual and constructive fraud, we conclude the trial court did not err in quieting title in favor of Warren and in making Merrill and Charmaine constructive trustees of the property for Warren's benefit.

### III. THE DOCTRINE OF UNCLEAN HANDS DOES NOT AUTOMATICALLY PRECLUDE EQUITABLE RELIEF.

Merrill argues Warren was not entitled to equitable relief of any sort because he was guilty of unclean hands. She asserts his entire claim for relief was premised on an illegal scheme to conspire to defraud the lender by having Charmaine secure the loan in her name and then fraudulently concealing from the lender Warren's ownership interest in the property. In addition, Merrill points out because of Warren's personal and substance abuse problems he would have lost the property altogether but for her efforts stopping the foreclosure and paying the arrearages.[24]

---

*De Leonis v. Hammel* (1905) 1 Cal.App. 390, 394 [82 P. 349] (generally equitable titleholder cannot successfully challenge legal title in a quiet title action).

[21] See, e.g., *Newport v. Hatton* (1924) 195 Cal. 132, 145 [231 P. 987] (because the defendants acquired title to the property through fraud and coercion the plaintiffs held paramount title unaffected by the defendants' collusive and fraudulent dealings).

[22] See, e.g., *Newport v. Hatton, supra*, 195 Cal. 132, 153 ("Any appropriate remedies required upon equitable considerations and justified by the pleadings and proof may be had in such a case.").

[23] *De Leonis v. Hammel, supra*, 1 Cal.App. 390, 394.

[24] Merrill argues the court abused its discretion under Evidence Code section 352 by excluding detailed evidence of Warren's substance abuse and his numerous homeowners' association violations. Her arguments are not well taken. Before trial the parties *stipulated on*

In a somewhat analogous situation, the Supreme Court long ago declared the doctrine of unclean hands does not automatically bar equitable relief where the parties are not equally at fault. As the Supreme Court explained it, " 'one cannot lay a trap for another, secure his confidence, induce him to make a conveyance of his property in expectation that it will be returned, and thereafter retain the fruits of his perfidy on the ground that the donor too readily yielded to temptation to save himself at the possible expense of his creditors. The greater offense of the tempter overshadows and renders innocuous the weakness of the one of whom advantage is taken. Though a deed made for an improper purpose is unfairly procured through the undue influence of the grantee, in violation of a fiduciary relationship, abuse of confidence, oppression or fraud, a court of equity will still grant relief to one in fault. Such relief will not be denied to a party least in fault against one who has led him into the act by a violation of confidence. They are not in equal wrong. [Citation.] Under the circumstances plaintiff should not be denied the relief he seeks.' "[25]

Although Warren's behavior was far from exemplary, we do not believe under the circumstances he and Merrill were equally at fault. True, Warren agreed to, and acquiesced in, what would have been an improper, if not impossible, plan to use Charmaine as a front in order for him to secure the loan. We note it was Merrill, not Warren, who proposed the "illegal plan." We also note the "illegal plan" never happened and thus Warren never participated in any "illegal scheme." Of course, the "illegal scheme" was not carried out because the fiduciary's own undisclosed plan was to instead take the property for her personal benefit. In the process of carrying out her plan Merrill defrauded her client out of the real property and his $77,000 down payment. And she did this to the very person to whom she owed fiduciary duties of loyalty, trust and full disclosure.

In these circumstances the trial court properly weighed the equities and found the doctrine of unclean hands did not automatically bar Warren from receiving relief in this case.[26]

---

*the record* evidence of Warren's substance abuse would be limited to evidence he went to the Betty Ford Center for treatment. There was also sufficient evidence presented to apprise the court, to the extent relevant, Warren had been the subject of numerous association violations, primarily for not paying association dues on a timely basis. In his testimony, Warren freely admitted to these and other derelictions.

[25] *Watson v. Poore* (1941) 18 Cal.2d 302, 312–313 [115 P.2d 478], quoting *Birney v. Birney* (1933) 217 Cal. 353, 359 [18 P.2d 672].

[26] See also *Johnson v. Johnson* (1987) 192 Cal.App.3d 551, 556–557 [237 Cal.Rptr. 644] (although using a straw person to secure a GI loan was improper and against public policy, applying the in pari delicto rule to preclude relief was improper because both parties were not equally at fault); *Norwood v. Judd* (1949) 93 Cal.App.2d 276 [209 P.2d 24] (although the

## IV. THE AWARD OF PUNITIVE DAMAGES NEED NOT BE REVERSED FOR LACK OF ACTUAL DAMAGES.

Merrill claims Warren did not prove any damages proximately caused by her and thus the award of punitive damages must be reversed.[27] She asserts his credit was too poor to secure a loan, he agreed to participate in an illegal scheme to defraud the lender, he gifted his $77,000 "option" money to Charmaine by signing the amendment in escrow, and because he defaulted on the mortgage and homeowners' association payments he would have lost the property anyway.

██ " ' "Exemplary or punitive damages are not recoverable as [a] matter of right. Their allowance rests entirely in the discretion of the [trier of fact], and they may be awarded only where there is some evidence of fraud, malice, express or implied, or oppression. Such damages are mere incidents to the cause of action and can never constitute the basis thereof. This being so, it is generally held that exemplary damages are not recoverable in the absence of a showing of actual damages.["] ' (*Clark v. McClurg* (1932) 215 Cal. 279, 282 [9 P.2d 505]; see also *Haydel v. Morton* (1935) 8 Cal.App.2d 730, 736 [48 P.2d 709].)"[28]

The short answer to Merrill's argument is actual damages *were* proved in this case. The evidence showed Merrill misappropriated his $77,000 down payment, later claiming he had forfeited this money by defaulting on mortgage and homeowners' association payments. In addition, the court awarded Warren $15,000 in *noneconomic* damages for the pain and suffering he endured from being defrauded out of his money, for being evicted from the home he thought he had purchased, and for nearly losing all his worldly possessions. This alone was a sufficient award of actual damages to support the award of punitive damages in this case.

---

painting and sandblasting business was conducted without a license a partner in the business could not rely on this illegality to avoid paying a departing partner his rightful share of the partnership profits).

[27] *All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1222 [228 Cal.Rptr. 736] (punitive damages may not be awarded where no actual damages are found).

[28] *All-West Design, Inc. v. Boozer, supra*, 183 Cal.App.3d 1212, 1222.

## DISPOSITION

The judgment is affirmed. Warren is awarded his costs on appeal.[29]

Perluss, P. J., and Zelon, J., concurred.

---

[29] Warren has requested an award of attorney fees on appeal. However, the record on appeal is inadequate for this court to even determine the basis for the award of attorney fees in the trial court. We therefore deny Warren's request for attorney fees without prejudice to renewing his request in the trial court upon issuance of the remitittur from this court.