Filed 5/22/13; pub. order 6/13/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LIBERTY NATIONAL ENTERPRISES, L.P., | B234341 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC 380261) |
| v. | |
| CHICAGO TITLE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Helen I. Bendix and Ralph W. Dau, Judges.  Reversed.

Shernoff Bidart Echeverria Bentley, Michael J. Bidart, Ricardo Echeverria; McDougal and Associates, Donald C. McDougal, Norman Paul Breen; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Hennelly & Grossfeld, and Susan J. Williams for Defendant and Appellant.

Garrett & Tully, Ryan C. Squire, Robert Garrett and Zi C. Lin for California Land Title Association as Amicus Curiae on behalf of Defendant and Appellant.

* * * * * *

Both parties in this title insurance coverage dispute -- Chicago Title Insurance Company (Chicago Title) and Liberty National Enterprises, L.P. (Liberty) -- appeal from the judgment awarding Liberty $1,083,292.38 in damages against Chicago Title. Chicago Title is the insurer and Liberty is the insured entity. The court trifurcated trial of this case. The first phase of trial determined that Chicago Title had a duty to defend Liberty in a third party lawsuit relating to the insured property. The second phase of trial determined Liberty's damages for breach of the duty to defend (breach of contract). The third phase of trial resolved Liberty's remaining cause of action for tortious breach of the implied covenant of good faith and fair dealing. The jury found in Chicago Title's favor on the breach of the implied covenant claim. Thus, the damages awarded in the judgment were solely those found by the court for breach of the duty to defend.

Chicago Title contends that the court erred in finding it breached the duty to defend. Liberty, for its part, contends that the court committed evidentiary and instructional errors in the phase three trial, and that it erred in ruling Liberty was not entitled to "lost opportunity" damages. We hold that Chicago Title had no duty to defend the third party lawsuit for which Liberty demanded the defense. This holding renders Liberty's appeal moot, as explained below. We reverse the judgment against Chicago Title for $1,083,292.38 and direct the trial court to enter judgment for Chicago Title.

## FACTUAL BACKGROUND

The commercial real estate property at the core of this title insurance dispute is commonly known as the Broadway Trade Center (BTC property) in Downtown Los Angeles. Liberty has owned the BTC property since approximately January 21, 1998. As part of purchasing the BTC property, Liberty obtained a preliminary title report and an owner's title insurance policy from Chicago Title.

Liberty is a California limited partnership formed in August 1993. Shahram Afshani has been the manager of Liberty's property and business affairs since it came into existence. Liberty's limited partners are Shahram, his brothers Shahriar and Parviz Afshani, Shahram's

2

brother-in-law, Saied Eshaghzadeh, and members of the Eshaghzadeh family.[1]  Liberty's general partner is a California corporation called A.F.S. Group, Inc.  A.F.S. Group, Inc.'s only shareholders are Shahram and Saied, and Shahram is the president of A.F.S. Group, Inc.

The Afshani brothers have a sister named Parvaneh Partielly.  She was married to Alber Partielly, who died in 2006.  Their son is Parham "Danny" Partielly.

## 1. *History of Ownership of the BTC Property*[2]

From at least 1988 to March 18, 1994, a California limited partnership called the Broadway Trade Center (BTC Partnership) owned the BTC property.  Alber, Parvaneh, and Danny Partielly were limited partners in the BTC Partnership.  The BTC property was encumbered by a first trust deed in favor of Union Federal Bank as of 1988.  The trust deed secured a loan of more than $16 million.

Around September 14, 1990, a California general partnership called American Financial Services (AFS)[3] loaned $2.3 million to the BTC Partnership (AFS loan).  The two partners making up AFS were Shahram and Shahriar.  A second deed of trust on the BTC property secured the AFS loan.

Alber and Parvaneh owned a 9.5 percent interest in the BTC property by virtue of being limited partners in the BTC Partnership.  After AFS loaned the money to the BTC Partnership, Alber and Parvaneh wanted to also acquire a 9.5 percent interest in the AFS loan.  AFS agreed to sell Alber and Parvaneh a 9.5 percent interest in the promissory note

---

[1]    Involved in this case are members of the Afshani family, the Eshaghzadeh family, and the Partielly family.  For the sake of clarity, we refer to these persons by their first names, rather than their shared surnames.  We do not intend this informality to reflect a lack of respect.

[2]    This history and the other subparts of the factual background section summarize evidence adduced at trial, consisting of stipulated facts, declarations filed by relevant individuals in lieu of direct testimony, live testimony of those individuals, and exhibits.

[3]    AFS is not to be confused with A.F.S. Group, Inc., a separate entity, although Shahram is involved in both entities.  While he is a shareholder and president of A.F.S. Group, Inc., he is a partner in AFS.

3

and second trust deed. The parties entered into a loan participation agreement on October 24, 1990. Alber and Parvaneh paid AFS $218,500 to acquire a 9.5 percent interest. The loan participation agreement "confirmed" the Partiellys' participation of 9.5 percent in the loan and "interests received under the loan," including a pro rata share of "any participation by us [AFS] in the Collateral as a result of foreclosure or otherwise." Pursuant to the agreement, AFS assigned a 9.5 percent interest in the AFS second trust deed to Alber and Parvaneh. This assignment was never recorded.

In March 1993, the BTC Partnership defaulted on the AFS loan. Around August 2, 1993, the BTC Partnership filed for bankruptcy. As of that date, the BTC Partnership had also defaulted on the Union Federal Bank loan. AFS obtained relief from the automatic bankruptcy stay and foreclosed on its second trust deed on the BTC property. AFS assigned a 90.5 percent interest in the second trust deed (representing all but the 9.5 percent interest assigned to the Partiellys) to The Garment Mart, a California limited partnership. At the trustee's sale in March 1994, The Garment Mart was the successful bidder at its own sale and acquired a 90.5 percent interest in title to the BTC property, taking subject to Union Federal Bank's first trust deed. On March 24, 1994, The Garment Mart transferred its interest in title to the Broadway Garment Mart (BGM), a California limited partnership. BGM was simply the new name chosen by The Garment Mart after the California Secretary of State required it to change its name. By the end of March 1994, Alber and Parvaneh knew about the foreclosure of the BTC property, the trustee's sale to The Garment Mart, and the transfer of title from The Garment Mart to BGM.

The BTC property was encumbered by four ground leases. Shahram, on behalf of BGM, decided to try to acquire the ground leases, which were not included as security for either the AFS loan or the Union Federal Bank loan, because he thought he could obtain priority over the Union Federal Bank trust deed in this manner. Shahram's brother-in-law, Saied, and Saied's family (the Eshaghzadehs) provided the funds to buy the ground leases. Shahram and the Eshaghzadehs acquired three of the four ground leases through an entity called Security Trust Company (Security Trust). They did not want either Union Federal Bank or the BTC Partnership (i.e., the Partiellys) to discover Shahram's plan to buy the

4

leases. Union Federal Bank eventually discovered that Security Trust was buying up the ground leases on the BTC property, and it purchased the fourth and last ground lease by doubling the amount Security Trust offered for it.

On or around March 29, 1994, BGM filed for bankruptcy. Shahram asked Alber and Parvaneh to become limited partners in BGM and support BGM's plan of reorganization. They declined and appeared in the bankruptcy action through counsel as secured creditors of BGM. In June 1994, BGM informed Alber and Parvaneh that Union Federal Bank was foreclosing on its first trust deed on the BTC property and that they should take appropriate action to protect their investment in the property. Union Federal Bank foreclosed on its first trust deed on July 11, 1994, and took title to the BTC property, excluding that portion subject to the ground leases. The foreclosure by the bank wiped out all junior interests in the BTC property.

The FDIC[4] closed Union Federal Bank and became the receiver of the bank in or around 1995. Liberty entered into an agreement with the FDIC in or around November 1997 to purchase title to the BTC property, including the fee interest under the ground lease Union Federal Bank had purchased. Liberty also entered into agreements with Security Trust to purchase the fee interests under the other three ground leases encumbering the property. Chicago Title handled the escrow for Liberty's purchases of the BTC property and the ground leases. Escrow closed on January 21, 1998. On that date, Chicago Title issued a title insurance policy to Liberty with a liability limit of $6.5 million.

## 2. *Terms of the Title Insurance Policy Issued by Chicago Title to Liberty*

The subject policy was written on a standard American Land Title Association (ALTA) owner's policy form. In pertinent part, the policy provides that Chicago Title insures Liberty against loss or damage, as of the date of the policy, "by reason of: [¶] 1. Title to the estate or interest described in Schedule A being vested other than as stated therein; [or] [¶] 2. Any defect in or lien or encumbrance on the title." The date of the

---

[4]  Federal Deposit Insurance Corporation.

policy is January 21, 1998, at 9:41 a.m., and Schedule A shows title to the BTC property being vested in Liberty.

The policy also provides that Chicago Title will "pay the costs, attorneys' fees and expenses incurred in defense of the title, as insured." More specifically, upon written request by Liberty, Chicago Title, "at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy."

The policy contains certain exclusions from coverage. As pertinent here, it excludes "[d]efects, liens, encumbrances, adverse claims or other matters: [¶] (a) created, suffered, assumed or agreed to by [Liberty]; [¶] (b) not known to [Chicago Title], not recorded in the public records at Date of Policy, but known to [Liberty] and not disclosed in writing to [Chicago Title] by [Liberty] prior to the date [Liberty] became an insured under this policy; [¶] (c) resulting in no loss or damage to [Liberty]; [or] [¶] (d) attaching or created subsequent to Date of Policy . . . ."

### 3. *The Partiellys' Lawsuit and Allegations Against Liberty*

On November 30, 2001, Alber and Parvaneh filed a lawsuit against Liberty and other defendants. (*Partielly v. Afshani* (Super. Ct. L.A. County, 2001, No. BC262703) (*Partielly* Action).) The Partiellys did not serve Liberty with the original complaint, but they served it with the first amended complaint (FAC) filed on May 30, 2002. In addition to Liberty, the FAC also named as defendants Shahram, his brothers Parviz and Shahriar, AFS, A.F.S. Group, Inc., and Security Trust.

The FAC alleged as follows in the "general allegations" section. Shahram was an agent of all entity defendants and was an agent of Shahriar and Parviz as well. To facilitate and conceal a pattern of fraudulent dealings, the defendants created a set of confusing and interlocking fictitious entities. For instance, Security Trust and Liberty were "one and the same parties comprised of the same ownership interests." The Afshani brothers were the owners, managers, officers, and directors of the entity defendants, including Liberty, and they consented to and ratified the actions taken in the name of the entity defendants.

6

Moreover, each of the defendants was the agent, servant, employee, or alter-ego of each of the remaining defendants, and there existed at all times a unity of interest and ownership between the entity defendants and the individual defendants. The individual defendants used the entity defendants, including Liberty, to avoid their obligations and duties to the Partiellys.

The FAC further alleged that in 1990, the BTC Partnership owned the BTC property, and the Partiellys acquired a 9.5 percent interest in the BTC property. In October of that year, the BTC Partnership borrowed $2.3 million from AFS to operate and maintain the property, which loan was secured by a trust deed. Also, the Partiellys entered into a loan participation agreement with AFS and the Afshani brothers giving the Partiellys a 9.5 percent interest in the loan "and in any and all interests of [AFS] and the Afshani brothers" in the BTC property. (Capitalization omitted.) As a result of the Afshani brothers' engagement in the loan participation agreement, the defendants owed a fiduciary and general duty to the Partiellys as partners to further the interests of all without exclusion or detriment to any member of the participation agreement partnership. The Partiellys were never properly paid funds collected by the defendants pursuant to the participation agreement partnership, nor were they given their ownership interest in "downstream transactions" regarding the property. The downstream transactions undertaken by the defendants to the exclusion and detriment of the Partiellys' interests included: (1) the acquisition of title to the BTC property by The Garment Mart, a defendant-controlled entity, at a foreclosure sale initiated by the defendants; (2) the transfer of title from The Garment Mart to another defendant-controlled entity, BGM; and (3) a series of transactions with the Eshaghzadeh family in which the defendants acquired interests in the property "to gain an advantage superior to that of Union Federal Bank," which was in the process of foreclosing on the property. Union Federal Bank ultimately held a trustee sale in July 1994, which the Partiellys alleged "did not have the effect of wiping out all of the ownership interests (fee title or otherwise in the nature of land leases)." As a result of the transactions with the Eshaghzadeh family, and in connection with the Eshaghzadehs, the defendants "were able to acquire full and complete title" to the BTC property on January 21, 1998, through Liberty.

7

These events took place without the Partiellys' knowledge "and to the exclusion of [the Partiellys] resulting from a series of representations made to [the Partiellys] in or about April, 1994, whereby certain Afshani brother defendants falsely and fraudulently represented to [the Partiellys] after inquiry being made that they had no further interests in the subject property, that they did not want to further attempt to acquire ownership of the subject property, that the property was no good and had no downstream financial value and that they intended to walk away and take no additional or active part, losing the original participation agreement loan investment of $2.3 million, all of which were frauds and misrepresentations and in violation of defendants', and each of their, fiduciary duties and obligations owed to [the Partiellys], their partners." (Capitalization omitted.)

As a result of the defendants' conduct, the Partiellys alleged they had been excluded from "any and all interest" in the BTC property, the contribution from the Eshaghzadeh family towards acquiring the property, and the cash flow from the property. In the defendants' ultimate acquisition of the property, they acted for purposes of excluding the ownership interests of the Partiellys and denying them "their fair share and entitlement in" the property.

The specific causes of action alleged in the FAC were for breach of contract, common counts, fraud, declaratory and injunctive relief, quiet title, breach of fiduciary duty, accounting, and unjust enrichment. All causes of action incorporated by reference the general allegations summarized above. The first cause of action for breach of contract alleged that the defendants had breached the loan participation agreement. The second cause of action for common counts alleged that the defendants became indebted to the Partiellys in or around 1998 because of their fraudulent and deceitful acts. The third cause of action for fraud alleged that all defendants had made false representations to the Partiellys regarding their entitlements under the loan participation agreement -- specifically, that the Partiellys would acquire a 9.5 percent interest in the $2.3 million loan, all fruits of the collateral, and all ongoing participation and downstream interests in the BTC property resulting from the efforts of their copartners (the defendants). Later, around April 1994, the defendants allegedly made false representations to the effect that the Partiellys' interest in

8

the property was lost and nothing further could be done. The defendants made these alleged false representations to induce the Partiellys to enter into the participation agreement, and later, to take no action with respect to the BTC property after the foreclosure sales in 1994.

The fourth cause of action for declaratory and injunctive relief alleged that the defendants "conspired to and induced" the Partiellys to enter into the loan participation agreement, whereby they "defrauded and deprived" the Partiellys of their interest in the BTC property and the $2.3 million loan, and they fraudulently obtained an interest in the property to the exclusion of the Partiellys, "denying [them] their 9.5% interest of the same." The Partiellys wanted the court to order the defendants to restrain them from doing anything with the property and to relinquish their interest in the property, and they also wanted a declaration that they had a 9.5 percent interest in the property.

The fifth cause of action for quiet title alleged that the defendants conspired and induced the Partiellys to enter into the loan participation agreement, which gave the Partiellys a 9.5 percent interest in the loan and any other interest AFS and Shahram had in the BTC property, yet the defendants were "now claim[ing]" 100 percent interest in the property to the exclusion of the Partiellys. They therefore wanted the court to quiet title against the claims of the defendants and enter a judgment that the Partiellys had title to the property and that the defendants had no interest in the property adverse to the Partiellys' 9.5 percent ownership.

## 4. *Liberty's Tender of Defense*

Liberty tendered the defense of the *Partielly* Action to Chicago Title on June 13, 2002. Chicago Title assigned senior claims counsel Douglas S. Avery to handle the claim. Chicago Title denied Liberty's claim in a letter from Avery dated July 11, 2002. Avery's letter noted that, while the Partiellys asserted a "9.5% interest in fee title to the insured property, the claim arises out of an alleged Participation Agreement entered into by Shahram Afshani as general partner of [AFS]." Avery noted that he did "not believe that a covered loss could be sustained in the event the [Partiellys] prevail in establishing they have an interest in the property based on the prior Participation Agreement," and moreover, "[t]he

9

only way [the Partiellys] could prevail would be based on a theory which would come directly within the Exclusions From Coverage."

Liberty retained Donald McDougal to defend the *Partielly* Action. He obtained a summary judgment and dismissal of the case in July 2004. The Partiellys appealed and the court of appeal reversed the judgment in June 2006. After the remitter issued, the parties settled the case for $500,000. The settlement agreement included a provision stating that the Partiellys' claims "ha[d] no merit and that Defendants committed no wrongs against [the Partiellys] with respect to the BTC Property, the AFS loan, the acquisition of the ground lease fee interests and the purchase of the BTC Property by Liberty." (Capitalization omitted.)

**PROCEDURAL HISTORY**

Liberty filed this action against Chicago Title in November 2007, based on Chicago Title's denial of a duty to defend the *Partielly* Action and a duty to indemnify Liberty. The first amended complaint alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.

*1. First Phase of Trial*

The court trifurcated the case for separate trials on coverage, damages, and breach of the implied covenant of good faith and fair dealing, with the coverage issue to be tried by the court first. Specifically, the bench trial was to determine whether Chicago Title had a duty to defend the *Partielly* Action because of the quiet title and declaratory relief claims asserted in it. The court conducted the bench trial on the coverage issue on March 25 and 26, 2009. The parties filed declarations from Avery, McDougal, and Shahram in lieu of direct examination testimony, and the parties were able to cross-examine these witnesses in court.

On October 26, 2009, the court filed its written statement of decision finding that Chicago Title had a duty to defend the *Partielly* Action. The court found that, on its face, the Partiellys' FAC contained claims falling within the first insuring clause of the policy -- that is, claims that title to the estate or interest were vested not entirely in Liberty, but in some other persons or entities. In particular, the court noted, the Partiellys were seeking a

10

declaration that they had a 9.5 percent interest in the BTC property and an injunction ordering Liberty to relinquish and surrender their interest in the property. As well, they sought to quiet title and a judgment giving them title to the property and stating that Liberty had no interest in the property adverse to the Partiellys' 9.5 percent interest. The court additionally found that the claims fell within the second insuring clause of the policy because they alleged a "defect in or lien or encumbrance on the title."

Moreover, the court found, none of the exclusions to coverage applied. There was no evidence that the Partiellys' adverse claim to 9.5 percent of the property was "created, suffered, assumed or agreed to" by Liberty, as described in exclusion 3.(a). As to exclusion 3.(b) for adverse claims known to Liberty but not known to Chicago Title, the court said the evidence established that neither Liberty nor Shahram had actual knowledge of the Partiellys' adverse claim when Chicago Title issued the policy in 1998. Instead, Shahram said he did not think the Partiellys had any possible claim to a 9.5 percent interest in the BTC property after Union Federal Bank foreclosed in 1994, and he had no actual knowledge that the Partiellys were asserting such a claim until he received the Partiellys' FAC in 2002. The court found Shahram to be credible. Additionally, Avery testified that when he was making his coverage decision, he had no reason to believe that Shahram had actual knowledge of the Partiellys' adverse claim until service of the FAC in 2002. The court said Avery "relied on a fiction that the Partiellys and [Shahram] should be treated as one in [*sic*] the same because of their familial connections," but Avery had a duty to not just accept the agency and alter ego claims in the *Partielly* FAC. As to exclusion 3.(c) for adverse claims "resulting in no loss or damage," the court found that Liberty clearly suffered loss when it paid the costs of defending and settling the *Partielly* Action. And as to exclusion 3.(d) for adverse claims "attaching or created subsequent to" the date of the policy, the court found the basis for the Partiellys' adverse claim existed prior to the date of the policy. The court went on to distinguish the two cases on which Chicago Title principally relied to argue there was no coverage, *Safeco Title Ins. Co. v. Moskopoulos* (1981) 116 Cal.App.3d 658 (*Moskopoulos*) and *Barczewski v. Commonwealth Land Title Ins. Co.* (1989) 210 Cal.App.3d 406 (*Barczewski*).

11

The court ruled, in sum, that "based on the terms of the Policy, the nature of the claims made in the Partielly Complaint, and the facts known to Mr. Avery prior to" his denial of Liberty's claim, "Chicago Title should have accepted Liberty's tender of defense and defended Liberty in the *Partielly* Action, at the very least, under a reservation of rights." (Italics added.)

## 2. *Second Phase of Trial*

The second trial phase was to determine the amount of damages for Chicago Title's breach of the duty to defend. This phase was also a bench trial and took place on March 24, 25, and 26, 2010. The court issued its written statement of decision on May 25, 2010. It awarded Liberty over $1 million in damages and prejudgment interest.

## 3. *Third Phase of Trial*

The third phase of trial commenced on May 23, 2011, and determined whether Chicago Title committed tortious breach of the implied covenant of good faith and fair dealing. This was the only phase of the trial that was a jury trial as opposed to a bench trial. The jury found in favor of Chicago Title and against Liberty on breach of the implied covenant of good faith and fair dealing.

On June 10, 2011, the court entered judgment in favor of Liberty for $1,083,292.38, the damages as determined by the court after the first two phases of trial. Both Chicago Title and Liberty filed timely notices of appeal. On February 21, 2013, we granted the application of the California Land Title Association (CLTA) to file an amicus brief in this matter.

## DISCUSSION

Chicago Title's sole contention on appeal is that the trial court erred in finding Chicago Title breached the duty to defend. In particular, it asserts that the *Partielly* Action did not fall within the policy's insuring clause, and even if the action did, one or more of the exclusion clauses applied to exclude the action from coverage, and it thus had no duty to defend. We agree that the insuring clause did not cover the *Partielly* Action and need not reach the secondary argument that one or more of the exclusions also applied.

12

### 1.  Background and General Precepts Relating to Title Insurance

"'Title insurance is a contract to indemnify against loss through defects in the title or against liens or encumbrances that may affect the title at the time when the policy is issued.'" (*Elysian Investment Group v. Stewart Title Guaranty Co.* (2002) 105 Cal.App.4th 315, 320.)[5]  Changes in the condition of title after the insurer issues the policy are outside the scope of coverage.  (*Rosen v. Nations Title Ins. Co.* (1997) 56 Cal.App.4th 1489, 1500 (*Rosen*).)  "Title insurance, as opposed to other types of insurance, does not insure against future events.  It is not forward looking.  It insures against losses resulting from differences between the actual title and the record title as of the date title is insured.  The policy does not guarantee the state of the title." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 41.)  Instead, title insurance protects against the possibility that liens or other encumbrances exist, even though they were missed in the title search or the preliminary title report.  (*Siegel v. Fidelity Nat. Title Ins. Co.* (1996) 46 Cal.App.4th 1181, 1191.)  A title insurer issues its policies on the basis of, and in reliance on, its own investigation into recorded instruments, which should impart constructive notice.  (*Quelimane Co. v. Stewart Title Guaranty Co.*, *supra*, at p. 41.)  The records on which a title insurer relies are generally public records concerning the status of title.  (*Ibid.*)  To a large extent, therefore, the title insurer is able to control the degree of risk it undertakes in issuing a policy by performing its own investigation beforehand.  (*Ibid.*)  But "[t]he records pertaining to real property are complex and encumbrances may be missed by even the most thorough search.  Title insurance is an acknowledgement that errors may have been made." (*Siegel v. Fidelity Nat. Title Ins. Co.*, *supra*, at p. 1191.)

There are essentially two types of title insurance policies available in California for owners of real property interests -- CLTA policies and ALTA policies.  (*Lick Mill Creek*

---

[5]      In relevant part, Insurance Code section 12340.1 states:  "'Title insurance' means insuring, guaranteeing or indemnifying owners of real or personal property . . . against loss or damage suffered by reason of:  [¶]  (a) Liens or encumbrances on, or defects in the title to said property;  [¶]  (b) Invalidity or unenforceability of any liens or encumbrances thereon;  or  [¶]  (c) Incorrectness of searches relating to the title to real or personal property." (See also Ins. Code, § 104.)

*Apartments v. Chicago Title Ins. Co.* (1991) 231 Cal.App.3d 1654, 1659.) CLTA policies insure primarily against defects in title that are discoverable through an examination of the public record. (*Ibid.*) CLTA policies protect against some risks not apparent from inspection of recorded instruments, such as "a forged, altered or improperly delivered deed, incompetency, incapacity, marital rights, or irregularities in any probate proceeding." (*Moskopoulos*, *supra*, 116 Cal.App.3d at p. 666.) ALTA policies, such as the type Liberty purchased here, provide greater coverage in that they also insure against "off-record defects, including rights of parties in possession and not shown on the public records, water rights, and discrepancies or conflicts in boundary lines and shortages in areas that are not reflected in the public record." (*Elysian Investment Group v. Stewart Title Guaranty Co.*, *supra*, 105 Cal.App.4th at p. 318, fn. 1.) But "[w]hile an ALTA policy provides greater coverage than a CLTA policy, it does not follow that an ALTA policy extends coverage to matters not affecting title." (*Lick Mill Creek Apartments v. Chicago Title Ins. Co.*, *supra*, at p. 1662.)

Well-established precepts of insurance coverage guide us in determining whether a policy requires a title insurer to defend a lawsuit filed by a third party against the insured. "It has long been a fundamental rule of law that an insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement. [Citations.] This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify. [Citation.] However, '"where there is no possibility of coverage, there is no duty to defend . . . ."' [Citation.] [T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 (*Waller*).) Facts both expressed and implied in the complaint will determine whether the duty to defend arises. (*Rosen*, *supra*, 56 Cal.App.4th at p. 1496.) Facts extrinsic to the complaint give rise to a duty to defend when they reveal a potential for coverage, though conversely, when extrinsic facts eliminate that potential, an insurer may decline to defend. (*Waller*, at p. 19.) The duty to defend applies even to noncovered claims so long as any of the claims asserted in the complaint discloses the potential for liability

14

covered by the policy. (*Rosen*, at pp. 1496-1497.) We resolve any doubt as to whether the facts or allegations establish a duty to defend in the insured's favor. (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 299-300.)

Though the insurer's duty to defend is broad, it "is not absolute but is measured by the nature and kinds of risks covered by the policy." (*Rosen, supra*, 56 Cal.App.4th at p. 1497.) Insurance policies contain two parts, the insuring clause defining the type of risks covered, and the exclusions, which remove coverage for certain risks initially within the insuring clause. (*Ibid.*) Before considering whether any exclusions apply, we examine the insuring clause to determine whether coverage exists at all. (*Ibid.*) An occurrence not within the insuring clause does not also have to be specifically excluded. (*Ibid.*)

The interpretation of an insurance policy presents a question of law and, as such, we will independently review the proper construction. (*Rosen, supra*, 56 Cal.App.4th at p. 1497.) The clear and explicit meaning of the policy provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or given a special meaning by usage, controls judicial interpretation. (*Waller*, *supra*, 11 Cal.4th at p. 18.) We will consider a policy provision ambiguous when it is capable of two or more constructions, both of which are reasonable. (*Ibid.*) Although an ambiguity in an insurance contract will be resolved adversely to the insurer, some actual or apparent ambiguity must be present before this rule comes into play. (*Moskopoulos*, *supra*, 116 Cal.App.3d at p. 665.) We are not free to "impose coverage by adopting a strained or absurd interpretation in order to create an ambiguity where none exists." (*Rosen*, *supra*, 56 Cal.App.4th at p. 1497.)

*2. No Coverage Under the Insuring Clause: The* **Moskopoulos** *Case*

In the case at bar, Chicago Title relies heavily on *Moskopoulos* to argue that the *Partielly* Action does not come within policy coverage, while Liberty argues the case is distinguishable. *Moskopolous* is on point and demonstrates why the *Partielly* Action is not a covered occurrence.

In *Moskopoulos*, the court held that title insurance does not protect against alleged tortious conduct by the insured in acquiring title. (*Moskopoulos*, *supra*, 116 Cal.App.3d at pp. 665-666.) Moskopoulos was a real estate broker who entered into negotiations with a

15

couple to buy their real property that was scheduled for a foreclosure sale. (*Id.* at pp. 661-662.) He believed they had come to an oral agreement for the sale, but the sellers thereafter sent him a counteroffer. (*Id*. at p. 662.) After they revoked the counteroffer, Moskopoulos filed an action against them for specific performance and recorded a lis pendens with respect to the subject property. (*Ibid.*) The trial court found that Moskopoulos was aware of the upcoming foreclosure sale and that the lis pendens would likely prevent the sellers from selling the property to someone else or refinancing. (*Ibid.*) The sellers settled with him and sold the property to him. (*Id.* at p. 663.) On the date the sellers conveyed the property to him, Safeco issued a policy insuring Moskopoulos's title to the property. (*Ibid.*) The sellers then brought an action against Moskopoulos based on the events leading up to his purchase of the subject property (sellers' action). They alleged causes of action for interference with contractual relations, constructive trust, fraud, breach of fiduciary duty, rescission, and abuse of process. (*Ibid.*) Moskopoulos tendered defense of the sellers' action to Safeco under his title insurance policy, and Safeco agreed to defend him subject to a reservation of rights. (*Ibid.*) Safeco then filed an action against Moskopoulos seeking a declaration that it had no duty to defend him in the sellers' action. (*Ibid*.) Safeco's declaratory relief action was before the court of appeal.

The court concluded that Safeco had no duty to defend Moskopoulos. (*Moskopoulos*, *supra*, 116 Cal.App.3d at p. 663.) In relevant part, the insuring clause of the Safeco policy was identical to the one here, in that it insured against loss or damage sustained by reason of "'[a]ny defect in or lien or encumbrance on [the] title.'" (*Id.* at p. 664.)[6] Moskopoulos contended the causes of action for rescission of the contract of sale and to have him declared a constructive trustee of the property were adverse claims that amounted to defects in title. (*Ibid.*) The court disagreed, holding that the allegations of the sellers' action pertained to

---

**6** While the relevant policy provisions in *Moskopoulos* are identical to those in Liberty's policy, *Moskopoulos* involved a CLTA policy, as opposed to the ALTA policy at issue here. At trial, Liberty stipulated not to distinguish *Moskopoulos* on the ground that it involved a CLTA policy and not an ALTA policy. Consistent with the spirit of that stipulation, we do not believe the distinction matters for our purposes.

16

Moskopoulos's conduct in his relations with the sellers -- in other words, the sellers' action related "not to [Moskopoulos's] title in the property, but to the manner in which he acquired title." (*Id.* at p. 665.) Elaborating, the court explained that the sellers' action alleged "intentionally tortious conduct by [Moskopoulos], not a defect in his title. There [was] not a suggestion in the record or the briefs of any matter constituting a defect in or lien or encumbrance on the record title to the [subject] property, except as disclosed in the policy. Nor [was] there any suggestion of any off-record risk in the chain of title coming within the policy coverage, such as a forged, altered or improperly delivered deed, incompetency, incapacity, marital rights, or irregularities in any probate proceeding. . . . An insurance company may limit the coverage of a policy issued by it. When it has done so, the plain language of the limitation must be respected." (*Id.* at p. 666.) The court determined that neither Moskopoulos's conduct leading up to the sellers' action nor the filing of the sellers' action came within policy coverage. (*Ibid.*)

Chicago Title argues this case is just like *Moskopoulos* in that the *Partielly* Action did not allege defects in title, but tortious conduct in the manner in which Liberty acquired title. Indeed, Chicago Title argues, the *Partielly* FAC stated that the defendants "were able to acquire *full and complete title* to the subject property on or about January 21, 1998 through the entity defendant Liberty" -- it was simply that the Partiellys were seeking to obtain an interest in title through equitable remedies based on tortious conduct by the defendants. (Italics added, capitalization omitted.)

Liberty counters that the FAC is internally inconsistent about whether Liberty had 100 percent title to the property. It points to allegations suggesting that the Partiellys *actually owned* a 9.5 percent interest in title to the property, not just that they were *seeking to obtain* such an interest. For instance, the FAC alleged that the Partiellys acquired a 9.5 percent interest in the property in 1990 by virtue of the loan participation agreement, and Union Federal Bank's foreclosure on the property in 1994 "did not have the effect of wiping out all of the ownership interests," which suggests the Partiellys believed their 9.5 percent interest in the property endured and was never eliminated. Liberty further cites to the prayer for relief, which asks for "a declaration that [the Partiellys] have a 9.5% interest in the

17

property," an injunction ordering the defendants "to relinquish and surrender [the Partiellys'] interest in the property to them," and a judgment that the Partiellys "have title to the property and that defendants . . . have no interest in the property adverse to [the Partiellys'] 9.5% ownership." (Capitalization omitted.) Liberty asserts that, on their face, these allegations stated title was not 100 percent vested in Liberty. Moreover, Liberty says, the Partiellys' assertion of a quiet title claim was evidence that they did not concede Liberty owned 100 percent title. This is purportedly because a quiet title claim "inherently presupposes that the plaintiff . . . possesses legal (as opposed to equitable) ownership in the property," and the claim is merely to eliminate an adverse claim and to perfect title in the legal owner.

Liberty acknowledges that the *Partielly* Action alleged tortious conduct by the insured in personal dealings, but it maintains that this quiet title claim makes all the difference in distinguishing this case from *Moskopoulos*. It says the plaintiffs suing Moskopoulos conceded they no longer held title to the property, and sought to get title back by invoking equitable claims. Those plaintiffs alleged no quiet title claim. Here, by contrast, the Partiellys had a quiet title claim presupposing that they currently held legal title to a 9.5 percent interest. The Partiellys were therefore alleging a defect in Liberty's title, Liberty asserts.

We are not persuaded by Liberty's arguments and its attempt to distinguish *Moskopoulos*. The *Partielly* Action was not covered by the insuring clause of Liberty's policy. To review, the insuring clause of the policy insured against loss sustained because of "[t]itle to the estate or interest . . . being vested other than" in Liberty, or "[a]ny defect in or lien or encumbrance on the title." According to our Supreme Court, "'the words "defective title" mean that the party claiming to own has not the whole title, but some other person has title to a part of portion of the land.'" (*Hocking v. Title Ins. & Trust Co.* (1951) 37 Cal.2d 644, 649.) As in *Moskopoulos*, the *Partielly* Action did not allege a defect in Liberty's title, but tortious conduct in the manner in which Liberty acquired title. (*Moskopoulos*, *supra*, 116 Cal.App.3d at p. 665; see also *Barczewski*, *supra*, 210 Cal.App.3d at p. 410 [lender's action acknowledged that insured trust deed was recorded

18

first and entitled to legal priority as matter of public record, but alleged should not be given legal priority because of insured's tortious conduct].) The allegations of tortious conduct should be apparent from our detailed discussion of the *Partielly* Action in the factual background section. The Partiellys alleged that they had a 9.5 percent interest in title to the BTC property by virtue of the loan participation agreement, but they were deprived of that interest when the defendants excluded them from "downstream transactions" in violation of a purported partnership agreement, and fraudulently represented that the BTC property was "no good" and that the defendants "intended to walk away and take no additional or active part" in it. The *Partielly* Action acknowledged that Liberty had *full and complete title* to the BTC property, and it sought to restore a 9.5 percent interest of which the Partiellys were wrongfully deprived. This situation is no different than *Moskopoulos*, in which the insured held legal title to the subject property, but the sellers sought to regain title (through a constructive trust or rescission) because the insured's alleged tortious conduct deprived them of it.

We do not see inconsistencies regarding whether Liberty had full and complete title. First, Liberty's reliance on the Partiellys' allegation that Union Federal Bank's foreclosure did not wipe out all the ownership interests is unconvincing. Liberty and Chicago Title stipulated at trial that the Union Federal Bank foreclosure in fact wiped out all junior interests in the BTC property, which would have included the Partiellys' 9.5 percent interest in the second trust deed. And Avery testified that when he was making his coverage decision, he understood the foreclosure had wiped out the interests of the second trust deed. Although this stipulated fact was extrinsic to the *Partielly* FAC, we (and the insurer) may rely on extrinsic facts to determine whether there was coverage. (*Waller*, *supra*, 11 Cal.4th at p. 19.)

Second, the statements cited by Liberty in the prayer for relief do not assist it. In asking for a declaration and judgment that the Partiellys have a 9.5 percent interest in the BTC property, the Partiellys were setting forth what they hoped to achieve in terms of equitable relief via the action. Such a request for future relief is not inconsistent with the acknowledgement in the body of the FAC that Liberty had acquired full and complete title.

19

Third, and last, Liberty's insistence that the quiet title claim makes all the difference ignores nuances in the law of quiet title. It is not always true that a quiet title claim "inherently presupposes" the plaintiff has legal, as opposed to equitable, title to the subject property. To be sure, the general rule is that the holder of equitable title cannot maintain a quiet title action against the holder of legal title. (*Warren v. Merrill* (2006) 143 Cal.App.4th 96, 113.) But an exception exists "when legal title has been acquired through fraud." (*Id.* at p. 114.) In that case, available "remedies include quieting title in the defrauded equitable title holder's name and making the legal title holder the constructive trustee of the property for the benefit of the defrauded equitable titleholder." (*Ibid.*) The Partiellys' allegations of fraud in Liberty's acquisition of title fall squarely within the exception. In other words, when one looks at the allegations of the *Partielly* FAC as a whole, it was not inconsistent to state that Liberty had acquired full title through tortious means but to also state a claim for quiet title.

In sum, the insuring clause of Liberty's policy did not cover the *Partielly* Action because the action did not allege defective title, but tortious conduct in the manner in which Liberty acquired title. There was no potential for coverage and therefore no duty to defend the *Partielly* Action. The judgment awarding Liberty damages against Chicago Title should be reversed. We may end our inquiry here, because an occurrence not within the insuring clause does not also have to be excluded by the policy's exclusions. We need not address the parties' arguments about whether any of the exclusions apply.

Moreover, our disposition of Chicago Title's appeal renders Liberty's appeal moot. Liberty's contentions in its appeal relate solely to purported errors the court made in the third phase of trial on breach of the implied covenant of good faith and fair dealing. But when there is no duty to defend under the terms of an insurance policy, there can be no action for breach of the implied covenant of good faith and fair dealing. (*Waller*, *supra*, 11 Cal.4th at p. 36 [when no potential for coverage and hence no duty to defend under the policy, no action for breach of the implied covenant of good faith and fair dealing lies "because the covenant is based on the contractual relationship between the insured and the insurer"].) Indeed, this appears to be why the court trifurcated proceedings and tried the

20

duty to defend first -- because it was a threshold issue. There was no duty to defend the *Partielly* Action. Therefore, Liberty had no cause of action for breach of the implied covenant of good faith and fair dealing. Any errors the trial court made in the third phase of trial adjudicating that claim were thus irrelevant, and any determination by us that the trial court erred would have no practical effect. Liberty's appeal is moot and should be dismissed. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214.)

## DISPOSITION

Liberty's appeal is dismissed. The judgment against Chicago Title is reversed. The trial court is directed to enter judgment on all causes of action for Chicago Title. Chicago Title to recover costs on appeal.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.

21

Filed 6/13/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LIBERTY NATIONAL ENTERPRISES, L.P., <br><br>     Plaintiff and Appellant, <br><br>     v. <br><br> CHICAGO TITLE INSURANCE COMPANY, <br><br>     Defendant and Appellant. | B234341 <br><br> (Los Angeles County <br> Super. Ct. No. BC 380261) <br><br> ORDER FOR PUBLICATION |

THE COURT:

IT IS HEREBY ORDERED that the opinion filed in the above matter on May 22, 2013, is certified for publication with no change in judgment.

_____

RUBIN, ACTING P. J.             FLIER, J.             GRIMES, J.