Filed 6/4/21  Medina v. Muro CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| NORMA MEDINA et al., | |
| Plaintiffs and Respondents, | G058243 |
| v. | (Super. Ct. No. 30-2015-00815501) |
| ROSALBA MURO et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Carmen R. Luege, Temporary Judge.**  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part, reversed in part.

The Litigation Practice Group and John M. Thompson for Defendants and Appellants.

The Appellate Law Firm and Berangere Allen-Blaine for Plaintiffs and Respondents.

\*          \*          \*

**Judge Carmen R. Luege was appointed to the Orange County Superior Court on March 25, 2021.

Plaintiffs Norma Medina and Javier Marquez Gutierrez (Javier)[1] alleged that numerous defendants participated in a scheme to defraud them of their home. Plaintiffs were facing foreclosure. Two of the defendants, who are not parties to this appeal, convinced plaintiffs to transfer title of their property to a third party who would pay off the defaulted loan by refinancing the property. Plaintiffs would make payments on the new loan, and title would be transferred back to them within a year. These promises were false. The third party secretly took out a new loan on the property and defaulted on it. Without plaintiffs' knowledge, the property was then transferred to defendants and appellants Artemio Marin (Artemio) and Rosalba Muro (together, appellants). Though appellants knowingly had no landlord-tenant relationship with plaintiffs, they evicted plaintiffs from the property.

Plaintiffs filed claims against the defendants for breach of contract, fraudulent misrepresentation, promissory fraud, equitable estoppel, and quiet title. Following a bench trial, the trial court entered judgment against all defendants (except one) on the quiet title, fraudulent misrepresentation, and promissory fraud claims and found the remaining claims to be moot. It awarded plaintiffs $151,391 in compensatory damages against both appellants and $50,000 in punitive damages against Artemio only.

Appellants challenge the judgment against them. First, they argue the judgment on the quiet title claim is not supported by the evidence. Primarily, they claim the property transfer to the third party was valid. But there is sufficient evidence showing that plaintiffs made this transfer based on the misrepresentation that title would be returned to them. Second, appellants contend there is no evidence they made any direct misrepresentations to defendants that could support the fraud claims. We agree with appellants in part. The evidence shows appellants made an indirect misrepresentation with the intent that it would reach plaintiffs and cause them to act. While this is

---

[1] Several parties in this case share last names. To avoid confusion, we refer to these parties by their first names.

sufficient to support plaintiffs' fraudulent misrepresentation claim, it does not form the basis for a promissory fraud claim.

Finally, appellants claim the trial court should have deducted from the damage award the sums they spent on the property, including lien and mortgage payments and money for repairs. They maintain that no compensatory damages would have been owed had the court made these deductions, which would have also eliminated plaintiffs' punitive damage award against Artemio. We find the trial court's decision not to make these deductions is supported by substantial evidence.

For these reasons, as to appellants, we reverse the judgment on the promissory fraud claim and affirm it in all other respects.

I

FACTS

*A. Background Facts*

Plaintiffs are husband and wife. In December 2003, Medina took out a loan to purchase a home for plaintiffs in Fullerton (the property). Medina defaulted on the loan in 2008. Plaintiffs tried to refinance the property but were unable to do so because of their credit. They sought help from defendant Victor Marquez Gutierrez (Victor), Javier's brother, who had a real estate background.

To retain the property, Victor advised plaintiffs to transfer it through a short sale to Isabel Lopez, Medina's longtime friend. Lopez agreed to help plaintiffs. She took out a $285,000 loan to purchase the property, and title was transferred to her name in in July 2009. Plaintiffs made the mortgage payments on this loan, which were about $1,700 a month. Initially, they would reimburse Lopez for checks she wrote to the lender. After a year, though, plaintiffs began paying the lender directly.

Though Lopez and plaintiffs do not recall the details, Lopez's loan went into default in May 2012. Because it was affecting her credit, Lopez asked that her name

be taken off the property and the loan. Plaintiffs again reached out to Victor for assistance. Initially, Victor attempted to have Javier jointly apply for a new loan with another family friend, but they were denied a loan due to their credit. Victor then reached out to his friend defendant Carlos Calvillo to inquire whether he knew of anyone that could purchase the property in a short sale. Victor and Calvillo had known each other since 2005. They both worked at the same real estate broker's office. At the time, Victor was a short sale negotiator, and Calvillo was an assistant to a sales agent.

Calvillo identified nonparty Jorge Sanchez Perez to Victor as a buyer. Plaintiffs had a meeting with Victor and Calvillo, in which the parties discussed the transaction with Perez. Perez did not attend the meeting, and plaintiffs never met him. Javier testified that Calvillo told plaintiffs that their only option to retain the property was to pay $12,000 to Perez to "sign and rescue the house." As plaintiffs described the transaction arranged by Victor and Calvillo, the property would be transferred to Perez. He would refinance the loan, and plaintiffs would make all the mortgage payments. Then, after six months to a year, Perez would transfer the property back to them. Plaintiffs could only obtain $8,000, which they gave to Victor in cash to give to Perez. Calvillo described the transaction somewhat differently. He testified that the parties agreed that Perez would purchase the property and then lease it back to plaintiffs with an option to buy after six months. Perez did not testify because he died in September 2016, prior to trial.

In August 2013, Lopez transferred title of the property to Perez, who obtained a $265,000 loan to purchase it. The amount of the monthly mortgage payment increased to around $2,670 a month. Plaintiffs continued to reside at the property and gave Calvillo money each month to cover the mortgage. Though they asked Victor for proof that the loan was being paid, they never received anything. Around June 2014, people began coming by the property and warning plaintiffs of an impending foreclosure. Plaintiffs sought an explanation from Calvillo, but he simply told them everything was

4

fine and that the payments were up to date. He provided no documentation showing the mortgage payments had been made. Plaintiffs stopped making payments to Calvillo since it appeared that he was not paying the mortgage.

It appears these foreclosure proceedings arose from a separate $25,000 loan that Perez took out on the property in March 2014, not the $265,000 loan he had used to purchase the property. The $25,000 loan went into default in June 2014. Plaintiffs did not know that Perez had taken out this loan.

Plaintiffs were unable to qualify for a loan to purchase the property from Perez to save it from foreclosure. They initially found a friend to purchase the property for them, but she backed out at the last minute. Calvillo then stepped in to purchase the property from Perez for $10,000, believing that only $1,500 was needed to bring the defaulted loan current. On June 3, 2014, Perez signed a grant deed transferring the property to Structure Equity, LLC, which was owned and managed by Calvillo's wife and Calvillo's father. The deed was not recorded at this time. Instead, as explained below, it was recorded after Calvillo found a new purchaser for the property. Plaintiffs were never told that the property had been transferred to Structure Equity.

After the property was transferred to Structure Equity, Calvillo discovered the reinstatement fee was around $30,000, which he could not afford.[2] A foreclosure sale was scheduled for October 16, 2014, so Calvillo began looking for another investor to purchase the property. He approached Artemio, the husband of Muro, about purchasing the property. Calvillo and Artemio knew each other from the real estate business.

On October 15, 2014, Structure Equity and Muro entered into a written agreement for the property. The agreement specified there were two liens on the property in Perez's name. The first was in the amount of $265,000 and was $9,000 behind in payments, and the second was for $29,738.15 and was currently in foreclosure (together,

---

[2] The $25,000 loan taken out by Perez contained a balloon payment that had matured, so the reinstatement fee included the balloon payment plus late fees and attorney fees.

5

the Perez liens). Under the agreement, Muro would pay Structure Equity $38,000 in exchange for title to the property, consisting of an initial payment of $5,000 with the remainder paid once plaintiffs had been removed from the property. If plaintiffs remained on the property after November 1, 2014, the amount of the remaining payment would be decreased by $2,600 each month. Eviction costs would also be deducted from the purchase price.

The same day this agreement was signed, Structure Equity signed a grant deed transferring title for the property from Structure Equity to Muro (Artemio was not on title).[3] The next day, two deeds relating to the property were recorded: (1) the deed transferring title from Perez to Structure Equity, and (2) the deed transferring title from Structure Equity to Muro. Artemio subsequently refinanced the property in Muro's name, and paid off the Perez liens.

Calvillo was initially responsible for evicting plaintiffs. He did not tell them about the transfer to Muro until after it occurred. And it does not appear that they understood the import of this transfer. For example, after the transfer, Javier received a three-day notice informing him that he owed Muro rent for the property. He thought the notice was incorrect because he believed plaintiffs still owned it.

Artemio grew impatient with Calvillo's efforts to remove plaintiffs from the property, so he filed an unlawful detainer complaint against them. Though Muro was listed as the plaintiff in the unlawful detainer action, the complaint was signed by Artemio as her agent. A default judgment was eventually entered against plaintiffs granting Muro possession of the property and $19,490 in damages. Plaintiffs were given notice to vacate the property by April 15, 2015. They vacated the property two days

_____

[3] There was evidence at trial that Muro was unaware of this transaction. She had generally given Artemio permission to enter real estate transactions in her name, and he had signed the agreement on her behalf without her knowledge. Regardless, Muro's knowledge of the transaction is not at issue in this appeal.

6

before the deadline because they were afraid of losing their personal property if they were locked out. Artemio then found new tenants. Due to the amount of time it took to evict plaintiffs and the eviction costs, appellants only paid the initial payment $5,000 to Structure Equity for the property.

A few months later, on July 7, 2015, Muro transferred the property via grant deed to nonparty Miguel Angel Jacob. Jacob took out a $432,000 loan to purchase the property. From this sum, $252,449 was used to pay off Muro's loan. Artemio received $151,391.77 of the remainder.[4] There was conflicting testimony regarding the reasons for this transfer. At trial, Artemio stated he was looking to sell the property and Jacob, a friend and former coworker, was looking for a house to purchase. In contrast, Jacob testified he was "help[ing] my friend." In particular, he gave Artemio his Social Security number and identification, allowed Artemio to run his credit, and then signed loan documents for the property.

Curiously, also on July 7, Jacob transferred the property to GDL Investments, LLC (GDL), which is owned by Ricardo Marin (Ricardo), the son of Artemio and Muro. GDL owned the property at the time of trial. Despite the transfer of title to GDL, the loan on the property remained in Jacob's name. Jacob never lived at the property and never paid the mortgage. Nor did Artemio pay Jacob for his assistance getting the loan. Instead, in return for the property, GDL transferred to Jacob title for the home in Anaheim where Muro and Artemio currently live. The mortgage for this Anaheim property is also in Jacob's name.

### B. Lawsuit and Trial

In January 2015, plaintiffs filed this lawsuit against Calvillo, Victor, Structure Equity, and Muro, among others. The complaint was later amended to add Artemio and other defendants. The operative complaint at the time of trial asserted

---

[4] It is unclear what happens to the remaining $28,153.23.

claims against all defendants for breach of contract, fraudulent misrepresentation, promissory fraud, equitable estoppel, and quiet title.

Prior to trial, several defendants were dismissed. Plaintiffs and the lender for the property also entered into a stipulated judgment before trial. When the bench trial in this case commenced in December 2018, the remaining defendants were Victor, Calvillo, Structure Equity, Artemio, Muro, Ricardo, and GDL. All these defendants were represented by the same counsel, except Victor, who represented himself.

Following trial, the court issued a statement of decision finding in favor of plaintiffs and against all defendants, except Ricardo, on the claims for fraudulent misrepresentation, promissory fraud, and quiet title. It ruled the breach of contract and equitable estoppel claims were moot given its findings on the fraud claims. No one objected to the statement of decision. Judgment was entered on June 28, 2019. The court quieted title to the property in favor of plaintiffs "subject to the Penny Mac recorded lien in the approximate sum of $424,175.00." It awarded compensatory damages to plaintiffs as follows: (1) $8,000 jointly against Victor, Calvillo, and Structure Equity; (2) $29,370 jointly against Calvillo and Structure Equity; and (3) $151,391 jointly against Artemio, Muro, and GDL Investments. The court also awarded punitive damages in the following amounts: (1) $50,000 jointly against Calvillo and Structure Equity; and (2) $50,000 jointly against Artemio and GDL.

Artemio and Muro appeal the judgment. First, they argue the courts finding on the quiet title claim is not supported by the evidence. Second, they contend they did not make any misrepresentations to support a finding of fraudulent misrepresentation or promissory fraud. Finally, they assert the court erred in awarding compensatory and punitive damages against them.

II

DISCUSSION

*A. Relevant Law*

Since no party filed any objections to the court's statement of decision, we "infer the trial court made implied factual findings favorable to the prevailing party on all issues necessary to support the judgment, including the omitted or ambiguously resolved issues." (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 59-60.) The trial court's factual findings, including those implied, are reviewed under the substantial evidence standard. (*Id*. at p. 60.)

On review for substantial evidence, we "'""must presume that the record contains evidence to support every finding of fact. . . . "'" [Citations.] It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. [Citation.] This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 (*Huong Que*).) "[W]e examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference." (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.) Further, we do "not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. [Citations.] The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589 (*Michael G.*).)

"'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient*. [Citation.]' [Citation.] '[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. He cannot shift this burden onto respondent, nor is a reviewing court required to undertake

9

an independent examination of the record when appellant has shirked his responsibility in this respect.'" (*Huong Que*, *supra*, 150 Cal.App.4th at p. 409.) If this requirement is not met, the appellant "fail[s] to rebut the presumption that the record contains evidence to support the trial court's findings on" the issue raised. (*Santa Clara Valley Water Dis. v. San Francisco Bay Regional Water Quality Control Bd.* (2020) 59 Cal.App.5th 199, 218; see *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, 1326 ["'[I]f, as defendants here contend, "some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived"'"].)

### B. Quiet Title

"The purpose of a quiet title action is to finally settle and determine the parties' conflicting claims to the property and to obtain a declaration of the interest of each party." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 298.) The trial court quieted title in plaintiffs' favor because there was clear and convincing evidence showing "all transfers of title commencing with the . . . purported sale to Jorge Sanchez Perez, through and including the transfer to defendant GDL Investments, involved some form of fraudulent conduct." Appellants argue the trial court's finding are not supported by clear and convincing evidence. We are not persuaded.

Plaintiffs' quiet title claim is based on an equitable interest in the property. "[T]he general rule is that the holder of equitable title cannot maintain a quiet title action against the holder of legal title. [Citation.] But an exception exists 'when legal title has been acquired through fraud.' [Citation.] In that case, available 'remedies include quieting title in the defrauded equitable title holder's name and making the legal title holder the constructive trustee of the property for the benefit of the defrauded equitable titleholder.'" (*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2013) 217 Cal.App.4th 62, 81.) "The owner of the legal title to property is presumed to be the

owner of the full beneficial title," and clear and convincing evidence is required to rebut this presumption. (Evid. Code, § 662.)

First, appellants argue title is currently vested in GDL, which is owned by Ricardo. Since Ricardo did not engage in fraud, appellants believe the trial court erred by stripping GDL of legal title. Appellants cite no authority to support this argument. Regardless, the trial court addressed this issue in the statement of decision. It found GDL is "a company managed on paper by [Ricardo], but actually controlled by defendant [Artemio]." Appellants do not contest this finding. And as explained below, Artemio engaged in fraud. Under the doctrine of implied findings, we must presume the trial court made the factual findings necessary to impute Artemio's fraud onto GDL. As such, it had sufficient basis to transfer legal title to the property from GDL to plaintiffs.

Next, appellants argue the trial court ignored evidence showing plaintiffs made valid sales to Lopez and Perez. They misunderstand the nature of our review. "'We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party.' [Citation.] So long as substantial evidence supports the trial court's findings, 'it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'" (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 592.)

"'A deed does not transfer title to the grantee until it has been legally delivered.' [Citations.] 'Delivery is a question of intent.'" (*Luna v. Brownell* (2010) 185 Cal.App.4th 668, 673 (*Luna*).) "[T]o constitute a valid delivery there must exist a mutual intention on the part of the parties, and particularly on the part of the grantor, to pass title to the property immediately. In other words, to be a valid delivery, the instrument must be meant by the grantor to be presently operative as a deed, that is, there must be the intent on the part of the grantor to divest himself presently of the title." (*Henneberry v. Henneberry* (1958) 164 Cal.App.2d 125, 129.) "Although physical

11

delivery of a deed raises an inference that the grantor intended to immediately transfer title, that inference may be overcome by evidence showing a contrary intent. [Citation.] The trier of fact must determine intent by reviewing all of the surrounding circumstances of the transaction." (*Luna, supra,* 185 Cal.App.4th at p. 673.)

Here, there is substantial evidence that plaintiffs did not intend to permanently divest themselves of title when transferring the property to Lopez and Perez. Rather, they transferred the property temporarily with the expectation that it would be returned to them in the future. As to Lopez, plaintiffs testified that they transferred title to her so they could refinance the property in her name. Lopez never paid the mortgage on the property. All payments were made by plaintiffs. Likewise, Lopez did not believe she was buying the property from plaintiffs. Rather, she only engaged in the transaction "to help Norma [Muro]." As to Perez, due to the misrepresentations of Victor and Calvillo, plaintiffs believed they were paying him $8,000 to temporarily take title of the property so he could refinance it for them. There is sufficient evidence in the record that they believed Perez would transfer title back to them within a year and that this arrangement was the only way to save the house from foreclosure.

Appellants also argue the court gave too much weight to the plaintiffs' testimony on these transactions and should have focused on the documentary evidence. But it was up to the trial court to determine the weight and credibility of the evidence. We do not reevaluate this process on appeal. (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

Finally, appellants argue that the court erred in quieting title in favor of plaintiffs because they had unclean hands. However, nothing in the record shows that appellants raised this issue with the trial court. Thus, they are precluded from making this argument on appeal. (*Watson v. Poore* (1941) 18 Cal.2d 302, 311-312.) Further, this argument would be rejected on its merits. "The defense of unclean hands arises from the maxim, ""He who comes into Equity must come with clean hands.""" (*Kendall-Jackson*

*Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978.) "Whether

. . . misconduct is a bar to the alleged claim for relief depends on (1) analogous case law,

(2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed

injuries." (*East West Bank v. Rio School Dist.* (2015) 235 Cal.App.4th 742, 751.)

Appellant's unclean hands argument is based on plaintiffs' inability to pay

their mortgage and their use of straw buyers to refinance the property and avoid

foreclosure. Appellants provide no analogous case law showing the unclean hands

doctrine has been applied in similar contexts. Failure to establish the first prong "is

sufficient to warrant the denial of the defense." (*East West Bank v. Rio School Dist.*,

*supra*, 235 Cal.App.4th at p. 751.) Further, the argument also fails on the second and

third prongs, which we consider together. A party's inability to pay their mortgage

should not warrant application of the doctrine. As to the use of strawmen, this fraudulent

scheme was orchestrated by Victor and Calvillo to take the property from plaintiffs. It

would be unfair to punish plaintiffs for relying on the misrepresentations of Victor and

Calvillo.

### C. Fraudulent Misrepresentation

The elements of a fraudulent misrepresentation claim are "(1) a knowingly

false representation by the defendant; (2) an intent to deceive or induce reliance; (3)

justifiable reliance by the plaintiff; and (4) resulting damages." (*Service by Medallion,

Inc. v. Clorox Co.* (1996) 44 Cal.App.4th 1807, 1816.) Appellants argue plaintiffs failed

to establish the first element, as it is undisputed that appellants never made any direct

misrepresentations to plaintiffs. Further, there are no conspiracy allegations that would

impute the misrepresentations of Victor and Calvillo to appellants, which plaintiffs

concede.

While appellants made no direct misrepresentations to plaintiffs, a fraud

claim can also be based on indirect misrepresentations. (*Varwig v. Anderson-Behel*

13

*Porsche/Audi, Inc.* (1977) 74 Cal.App.3d 578, 580.) "'The maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transactions involved.'" (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 681.)

The trial court found appellants "committed fraud in connection with the unlawful detainer case they caused to be filed against plaintiff Medina." Among other things, the trial court stated that appellants knew they were not in a landlord-tenant relationship with plaintiffs and the lawsuit was based on a fraudulent grant deed. Appellants do not challenge these findings, and, given the specific facts in this case, these misrepresentations can support a fraud claim against appellants. Although the misrepresentations were not made directly to plaintiffs, they were made to obtain a default judgment from the court so that appellants could fraudulently evict plaintiffs. Appellants undoubtedly intended that these misrepresentations would be repeated to plaintiffs in an order from the court, which would cause plaintiffs to vacate the property.

Appellants do not contend that plaintiffs failed to meet any of the other elements of fraud, so we will not address them. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.) While appellants make arguments regarding damages, their arguments relate to the amount of damages awarded, which we address below.

### D. Promissory Fraud

"'"Promissory fraud" is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.'" (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951,

973.) The elements for a promissory fraud claim are largely the same as a fraudulent misrepresentation claim. However, the false representation element is narrower. It requires a showing that "(1) the defendant made a representation of intent to perform some future action, i.e., the defendant made a promise, and (2) the defendant did not really have that intent at the time that the promise was made, i.e., the promise was false." (*Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1060.)

Similar to the fraudulent misrepresentation claim, appellants argue they made no false promises to plaintiffs. We agree. The trial court found Victor and Calvillo falsely promised plaintiffs that Perez would transfer title back to them after six months. These promises were not made by appellants, and plaintiffs admit that appellants did not conspire with Victor and Calvillo. Nor do they argue these false promises can be imputed to appellants under any other legal theory. Further, nothing in the record shows that appellants made any false promises to plaintiffs. As such, the trial court erred by finding plaintiffs prevailed against defendants on this claim.

### E. Damages

Under Civil Code section 3343, the defrauded victim in a real estate transfer "is entitled to recover not only the difference between the actual value of that with which he parted and the actual value of that which he received (out-of-pocket) but also any additional damage arising from the particular transaction *including* any of the following: 1. amounts expended in reliance upon the fraud; 2. amounts compensating for loss of use and enjoyment of the property due to the fraud; and 3. an amount which would compensate him for the profits or other gains by the use of the property had he retained it." (*Channell v. Anthony* (1976) 58 Cal.App.3d 290, 312.)[5]

---

[5] Plaintiffs argues a different standard is applied to fiduciaries, but there is no evidence in the record showing appellants were the fiduciaries of plaintiffs.

15

The court awarded plaintiffs $151,391 in compensatory damage against appellants and GDL Investments, which represents the equity appellants received when they sold the property to Jacob.  Appellants claim this amount is incorrect and that the trial court should have deducted the amounts appellants spent bringing the Perez liens current, paying the mortgage, and fixing up the property.  The doctrine of implied findings applies to damage awards.  (*Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 771.)  So, we infer the trial court found that appellants were not entitled to any deductions from the $151,391 award.  There is sufficient evidence in the record to support that finding.

The only evidence cited by appellants supporting these claims is the testimony of Artemio.  Given that the court found against him on the fraud claim, we can reasonably infer that the court did not find his testimony credible.  This is a sufficient reason to deny the deductions.  Further, Artemio's testimony was not definite enough to determine whether any deductions were warranted.  As to the Perez liens, Artemio testified it cost "approximately" $44,000 to bring the Perez liens current.  He also testified that the mortgage payment increased to $5,000 a month in January 2015, but he does not state how much the mortgage was prior to that date, the total amount appellants paid on the mortgage, or how many months they paid the mortgage.  As to the money spent fixing up the property, Artemio testified that he spent $50,050, but there is no documentation in the record to substantiate this claim.  Nor have appellants pointed to any testimony showing exactly what was fixed.

16

## III

## DISPOSITION

The trial court's judgment is reversed as to the claim for promissory fraud. It is affirmed in all other respects.  Plaintiffs are entitled to their costs on appeal.


                                        MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


GOETHALS, J.