Filed 8/27/21 ULRS v. Badax CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| ULRS, Inc., | B294566 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BC608439 |
| Badax, LLC, | |
| Defendant and Appellant. | |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge. Affirmed.

Gordinier Kang & Kim and Edward S. Kim for Defendant and Appellant.

Lanak & Hanna, Craig P. Bronstein and Michael K. Murray for Plaintiff and Respondent.

# INTRODUCTION

This case, though complex, is essentially a debt collection action. In a prior case, Delta Aliraq, Inc. obtained a multi-million-dollar judgment against its former chief executive officer, David Weisman. Delta Aliraq assigned its interest in the judgment to plaintiff and respondent ULRS, Inc. ULRS then initiated the present action against Barbara Anne Klein, Weisman's estranged wife, and her limited liability company, Badax, LLC. ULRS alleged that Weisman used money he had stolen from Delta Aliraq to give Klein a series of monetary gifts and to purchase and improve a residence to which Badax held title.

To reach assets held by Klein and Badax, ULRS asserted two theories of liability: fraudulent transfer under the Uniform Voidable Transactions Act (UVTA) (Civ. Code, § 3439 et seq.) and a creditor's claim under Code of Civil Procedure section 708.210. Following a five-day bench trial, the court found largely in favor of ULRS under both theories of liability. The court apportioned the ownership of the residence, giving ULRS a 66 percent interest and Badax the remaining 34 percent. In addition, the court awarded ULRS $60,000 against Klein, representing three checks written by Weisman to Klein and deposited in a checking account bearing both their names.

On appeal, defendant and appellant Badax argues principally that the fraudulent transfer claims should be reversed because they are barred by the statute of limitations and, even if the claims are not barred, they are not supported by substantial

2

evidence.[1] We need not address these assertions, however, because Badax fails to challenge adequately the alternative basis for the judgment, i.e., the creditor's claim. We conclude, therefore, that Badax has failed to meet its burden to establish error on appeal and, in any event, substantial evidence supports the court's judgment based on the creditor's claim. Finally, we reject Badax's contention that irregularity in the proceedings required the court to grant its motion for a new trial. Accordingly, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND[2]

### 1.    Background

Weisman and Klein met in May 2009, became engaged in June 2010, and were married in March 2011. The couple separated in mid-2014 and they were attempting to finalize their divorce at the time of trial in this matter. Klein formed her limited liability company, Badax, in August 2010 and she was the only member.

During all relevant times, Delta Aliraq performed reconstruction projects in Iraq. In 2009, Weisman and two limited liability companies he controlled, Delta Alpha X-ray, LLC (DAX) and Davro, LLC (Davro) (collectively, the Weisman

---

[1] Although Klein also appealed, the appellate briefs were submitted only on behalf of Badax. Accordingly, we do not address the arguments that relate only to Klein.

[2] Pursuant to Evidence Code sections 452 and 459, we take judicial notice of the judgment and statement of decision in the suit between Delta Aliraq and Weisman. We rely on these documents solely to provide factual background concerning the prior litigation.

entities) invested in Delta Aliraq and Weisman became the chief executive officer of Delta Aliraq. By mid- to late-2011, however, some board members of Delta Aliraq began to suspect that Weisman was stealing money from Delta Aliraq. The board of directors fired Weisman in early 2012.

## 2.     The Prior Litigation

After Delta Aliraq fired Weisman, he sued Delta Aliraq and Delta Aliraq filed a cross-complaint against Weisman, DAX, and Davro. Delta Aliraq's operative cross-complaint included the following causes of action: fraud and conspiracy against Weisman, fraud and deceit against Weisman and Davro, breach of fiduciary duty against Weisman, interference with prospective economic advantage against Weisman and Davro, and breach of contract against Davro and DAX.

The court concluded that Weisman induced Delta Aliraq to hire him by misrepresenting his qualifications and abilities, Weisman breached his fiduciary duty to Delta Aliraq by systematically misappropriating large amounts of money from the company, and that DAX and Davro breached their written investment agreement with Delta Aliraq by taking money from the company that was not authorized under the agreement. The court awarded Delta Aliraq compensatory damages of $6,589,809 against Weisman and Davro, jointly and severally. The court also found DAX and Davro were Weisman's alter egos and that Weisman, DAX, and Davro acted with malice, oppression and fraud. The court awarded Delta Aliraq $1,000,000 in punitive damages against Weisman, DAX, and Davro, jointly and severally.

Delta Aliraq subsequently transferred its interest in the judgment to ULRS.

4

### 3. The Present Action Against Klein and Badax

#### 3.1. Complaint and Answer

ULRS filed the present action against numerous parties including Klein and Badax. As to Klein and Badax, the complaint asserted three causes of action. One cause of action for fraudulent transfer under the UVTA named Badax and alleged that Weisman, through DAX and/or Davro, transferred more than $850,000 to an escrow account relating to the purchase of a residence in Chatsworth (the residence) to which Badax held title. Further, the complaint alleged, Weisman, though DAX, paid more than $188,000 for improvements to the residence. Badax provided nothing of value in exchange for title to the residence and the transfers, and the decision to title the property in the name of Badax was designed to hinder, delay, or defraud Weisman's creditors. A second cause of action for fraudulent transfer, this one against Klein, alleged that in order to deceive Weisman's creditors, DAX transferred $116,000 to Klein between December 2010 and January 2012. Finally, as to both Klein and Badax, ULRS asserted a creditor's claim (Code Civ. Proc., § 708.210 et seq.) alleging that ULRS had a money judgment against the Weisman entities in the amount of $7,589,809 which it had been unable to satisfy and that Badax and Klein were in possession or control of assets or property in which the Weisman entities had an interest.

Klein and Badax denied the allegations of the complaint and asserted numerous affirmative defenses.

#### 3.2. Badax's Motion for Summary Adjudication

Badax moved for summary adjudication on the fraudulent transfer claim insofar as it related to the purchase of the

residence, arguing mainly that the claim was barred by the four-year statute of limitations and/or the one-year delayed discovery rule found in Civil Code section 3439.09, subdivision (a). Specifically, Badax asserted that the purchase of the residence closed on January 12, 2012 and ULRS did not file its complaint until January 27, 2016—more than four years after the purchase. The court denied the motion.

### 3.3.  Bench Trial[3]

A bench trial took place over five days in April 2018, during which Klein testified extensively concerning her engagement and marriage to Weisman, the funds used to purchase the residence, and money and other generous gifts she received from Weisman both before and during the marriage. Klein also confirmed, and attempted to explain, a Gordian knot of financial transactions that took place from mid-2010 to late 2012 between herself and Badax on one side and Weisman, DAX, and Davro on the other.

The court also heard testimony from two former board members of Delta Aliraq about that company's operations, Weisman's involvement with the company, their suspicions in mid- to late-2011 that Weisman was stealing money from the company, the board's ultimate decision to terminate Weisman's employment, and the multi-million-dollar judgment obtained by Delta Aliraq against Weisman, DAX, and Davro in the prior litigation. In addition, a forensic accounting expert testified for ULRS regarding financial transactions between Weisman, through DAX and Davro, Klein, and Badax.

---

[3] We present a more detailed discussion of those facts relevant to our decision *post*.

Neither side called Weisman to testify.

### 3.4. Judgment and Statement of Decision

The court issued a detailed statement of decision containing its findings. As an initial matter, the court concluded that some of Klein's testimony was credible and, further, that she had likely been unaware of Weisman's scheme to hide money from his creditors. But the court also found that Weisman's actions and the explanations he provided to Klein, as well as some of Klein's explanations during her testimony, were "incredible," "fantastic," and "unbelievable."

The bulk of the court's analysis regarding the convoluted and often conflicting evidence focused on the UVTA claims— specifically, whether Weisman intended to hinder, delay, or defraud his creditors. Stated generally, the court found that explanations for most of the transactions between the Weisman entities and Klein and/or Badax were simply not credible, and, in many instances, Klein's testimony was internally inconsistent or was contradicted by other evidence or basic common sense. The court concluded that ULRS met its burden to demonstrate fraudulent transfers under the UVTA, particularly as to the residence but also as to three checks written from the Weisman entities to Klein and deposited into a checking account in her name and Weisman's. The court also found that ULRS established its creditor's suit as to the residence as well as the three checks at issue.

The court awarded ULRS a money judgment against Klein in the amount of $60,000—the value of the three checks. After noting that the precise remedy concerning the residence was largely a matter of equity, the court apportioned the interest in the residence between the Weisman entities and Badax

7

consistent with their relative financial contributions. Specifically, the court concluded that the Weisman entities deposited all funds into escrow for the purchase of the residence, paid all the interest on the one-year mortgage loan, paid the principal on the mortgage loan, and paid approximately $300,000 for improvements to the residence. Badax, meanwhile, had repaid DAX $717,952 of the money the Weisman entities placed into escrow. The court awarded Badax a 34 percent interest in the residence and concluded ULRS, in place of the Weisman entities, was entitled to a 66 percent interest in the residence.

### 3.5. The Motion for New Trial

Klein and Badax filed a timely motion for new trial, arguing that they had been deprived of a fair trial due to misconduct by counsel for ULRS. Specifically, they contended that counsel for ULRS repeatedly referred to facts not in evidence, i.e., that Weisman had been seen with Klein in the courthouse during the trial and that, not coincidentally, Klein later offered documentary evidence (DAX's 2009 tax return) not disclosed during discovery. No evidence was admitted concerning Weisman's supposed visit to the courthouse to collaborate with Klein, however. Nevertheless, counsel alluded to Weisman's supposed presence in the courthouse in ULRS's closing brief and in a subsequent brief regarding the form of judgment.

The court concluded that counsel for ULRS committed misconduct but, as discussed in detail *post*, the misconduct was not prejudicial. Accordingly, the court denied the motion.

8

### 4. Entry of Judgment and the Appeal

The court entered judgment in favor of ULRS on October 16, 2018. The court denied the motion for new trial on December 10, 2018. Badax timely appeals.

## DISCUSSION

### 1. Badax fails to demonstrate error concerning the creditor's claim, one of the two alternative bases for the judgment.

#### 1.1. The Appellant's Burden on Appeal

The most fundamental rule of appellate review is that the judgment or order challenged on appeal is presumed to be correct, and "it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

In addition, parties must provide citations to the appellate record directing the court to the supporting evidence for each factual assertion contained in that party's briefs. When an opening brief fails to make appropriate references to the record in connection with points urged on appeal, the appellate court may treat those points as waived or forfeited. (See, e.g., *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 384; *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 779–801 [several contentions on appeal "forfeited" because appellant failed to provide a single record citation demonstrating it raised those contentions at trial].) Further, "an appellant must present argument and authorities on

9

each point to which error is asserted or else the issue is waived." (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 867.) Matters not properly raised or that lack adequate legal discussion will be deemed forfeited. (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655–656.)

### 1.2. Analysis

As noted *ante*, the court found in favor of ULRS and awarded damages under two alternative legal theories— fraudulent transfer under the UVTA and a creditor's claim under Code of Civil Procedure section 708.210 et. seq. We may, of course, affirm the judgment on either of the alternative legal grounds. (E.g., *Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 981 [judgment will not be set aside on appeal even if court misapplied the law so long as any other correct legal theory supports the judgment].)

Badax's opening brief focuses myopically on the fraudulent transfer claims. Badax's first legal argument—that the claims made under the UVTA are barred by the statute of limitations— does not mention the creditor's claim. And because the applicable statutes of limitations are different (compare Civ. Code, § 3439.09, subd. (a) with Code Civ. Proc., § 708.230), we will not assume Badax intended to attack the creditor's claim on that basis.

Badax's second argument—that the judgment is not supported by substantial evidence—is explicitly limited to the claims asserted under the UVTA. The heading of that section states, "there is no substantial evidence to support judgment on the second cause of action for fraudulent transfer" and the analysis is so limited.

10

In fact, Badax devotes only three short paragraphs at the end of its 66-page opening brief to the creditor's claim. The first sentence summarizes the argument: "Since there is no substantial evidence that DAX or DAVRO transferred funds to Badax with the actual intent to hinder, delay or defraud its creditors, Plaintiff's seventh cause of action for a creditor's suit also fails." But a creditor's claim is not identical to or derivative of a claim under the UVTA. As we explain *post*, a creditor's claim does not require the creditor to prove fraudulent intent and therefore the absence of evidence of Weisman's intent vis a vis his creditors is of no moment.

In its reply brief, Badax asserts additional arguments, namely, that neither DAX nor Davro ever made a claim against Badax concerning the residence or sought repayment of money transferred to Klein. It also contends DAX and Davro could not have asserted a claim of ownership in the residence because they received no security interest in the residence and, therefore, the court erred by awarding ULRS "greater rights and remedies" than DAX and Davro could have obtained directly. By failing to raise or develop these arguments in its opening brief, Badax has forfeited them. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9, ["the claim is omitted from the opening brief and thus waived"]; *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief are deemed waived or abandoned."]; *Heshejin v. Rostami* (2020) 54 Cal.App.5th 984, 995, fn. 11 [same].)

In any event, DAX and Davro could have brought an action against Klein and Badax under an equitable theory such as constructive trust. (See, e.g., *Cabral v. Soares* (2007) 157 Cal.App.4th 1234, 1242–1243 (*Cabral*).) And adhering to the rule

11

that an appellate court views the record in the light most favorable to the prevailing party and draws all reasonable inferences in favor of the judgment, we conclude the court did not err in determining that Badax's denial that DAX and Davro had an interest in the residence or that it is indebted to those entities was not credible. (See *Evans v. Paye* (1995) 32 Cal.App.4th 265, 270 ["Once the judgment creditor has presented prima facie evidence of the existence of a debt by the third person to the judgment debtor, the burden shifts to the third person to show by a preponderance of the evidence that his or her denial of the debt is made in good faith. The third person does not satisfy this burden simply by offering an explanation which, on its face, is not patently frivolous or an obvious sham."].)

In sum, the judgment in favor of ULRS rests on two alternative legal grounds and in essence Badax has only challenged one. Its failure to demonstrate error relating to the creditor's claim theory of liability is, standing alone, fatal to its appeal.

## 2. The judgment against Badax based on the creditor's claim is supported by substantial evidence.

Given Badax's failure to make a viable challenge to the judgment based on the creditor's claim, we could decline to consider whether the judgment is supported by substantial evidence. But in the interest of completeness, we address the issue.

### 2.1. Standard of Review

"On appeal from a judgment based on a statement of decision after a bench trial, we review the trial court's conclusions of law de novo and its findings of fact for substantial

12

evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Under the deferential substantial evidence standard of review, we 'liberally construe[ ]' findings of fact 'to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings.' (*Ibid.*) 'We may not reweigh the evidence and are bound by the trial court's credibility determinations.' (*Estate of Young* (2008) 160 Cal.App.4th 62, 76.) Testimony believed by the trial court 'may be rejected only when it is inherently improbable or incredible, i.e., " 'unbelievable *per se*,' " physically impossible or " 'wholly unacceptable to reasonable minds.' " ' (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.) ' "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." ' (*Estate of Young*, at p. 76.)" (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257 (*McPherson*).)

### 2.2. Creditor's Claim

A creditor's claim is one of several avenues available to a creditor attempting to enforce a judgment. Code of Civil Procedure section 708.210 provides: "If a third person has possession or control of property in which the judgment debtor has an interest or is indebted to the judgment debtor, the judgment creditor may bring an action against the third person to have the interest or debt applied to the satisfaction of the money judgment." One comment of the Law Revision Commission observes that "[i]t is anticipated ... that less expensive and less cumbersome enforcement procedures will be used in the normal case." (Cal. Law Revision Com. com preceding § 708.210.) But a creditor's suit may be necessary if, as here, there is a dispute concerning ownership of the property held by the third party or

13

"where for some other reason the judgment creditor believes that the third person will not cooperate." (*Ibid*.)

For example, in *Cabral, supra,* the plaintiff was owed substantial child and spousal support arrears from her ex-husband, James. The plaintiff alleged that James's mother, in cahoots with James's sister, changed the mother's will shortly before her death to redirect James's inheritance to his sister, who would in turn secretly give the funds to James. The court noted that, in that circumstance, James could bring an action to impose a constructive trust on the funds received by his sister as to which he held a beneficial interest. Therefore, the court held, the plaintiff, standing in James's shoes, could properly bring a creditor's suit against James's sister to recover those funds to which James was entitled. The court noted that the sister, who was (or soon would be) in possession of funds destined for James, was unlikely to cooperate with the plaintiff's collection efforts and therefore a creditor's suit was an appropriate, if little used, legal vehicle for the plaintiff to enforce her family law judgment against her ex-husband. (*Cabral, supra,* 157 Cal.App.4th at pp. 1242–1243.)

### 2.3. Substantial evidence supports the court's apportionment of the beneficial interest in the residence.

The court found by clear and convincing evidence (see Evid. Code, § 662) that although Badax held record title to the residence, the record title did not reflect true beneficial title. The court apportioned the beneficial interest in the residence based on the relative financial contributions made by DAX, Davro, and Badax, finding that Badax's interest in the house was only 34 percent because Badax contributed $717,952 and the Weisman

14

entities contributed the remainder of the $2,111,695.83 paid for the residence and improvements. Specifically, the court found the Weisman entities deposited all funds into escrow for the purchase of the residence, paid all the interest on the mortgage loan, paid the principal on the mortgage loan, and paid for substantial improvements to the residence. Although Klein testified that most, if not all, of the payments made by DAX and Davro were repayments of loans made by Klein and/or Badax to DAX and Davro or were in lieu of rent relating to the space Weisman used in the residence as an office, the court largely rejected her explanations as not credible. As we now explain, the court's findings are supported by substantial evidence.

### 2.3.1. The Weisman entities provided the funds to purchase the residence. Badax took title.

Klein and Weisman decided to buy the residence in August 2011. Weisman signed the offer, and the purchaser was listed as "David Weisman and/or assigns." The purchase price for the residence was approximately $1.7 million plus taxes, fees, commissions, and other charges. The purchase was funded with $857,172.91 in cash and a mortgage loan in the amount of $895,000. Klein acknowledged that the Weisman entities transferred all the necessary cash into the escrow account used for the purchase of the residence.

Shortly before escrow closed, Weisman assigned the right to purchase the residence to Badax. Badax took title to the residence.

### 2.3.2. Badax repaid a portion of the funds deposited into escrow.

Klein testified that she repaid the Weisman entities all the money they put into escrow to fund the purchase of the residence. The court found this testimony credible, in part.

According to Klein, in honor of the couple's engagement, Weisman gave her an Oscar statuette that had been awarded to Orson Welles in connection with his 1941 film, Citizen Kane. The gift was purportedly memorialized by a gift certificate Weisman made for Klein. Klein said she later transferred the statuette to Badax so that Badax could purchase the residence. In November 2011, Klein decided to sell the statuette and use the funds for the purchase. With Weisman's assistance, the statuette was sold in December 2011.

The "hammer price" for the statuette was $717,952 and the net amount ($714,952) was sent via wire transfer to an account in the name of DAX. Klein explained that the Weisman entities had deposited money into the escrow account to fund the purchase of the residence, but she had always intended to repay the Weisman entities with the money received from the sale of the Oscar. Although Klein said the loan from the Weisman entities had been fully repaid, she could not explain the discrepancy (approximately $142,000) between the amount placed into escrow by the Weisman entities ($857,172.91) and the lesser amount ($714,952) DAX later received.

Notwithstanding a great deal of evidence to the contrary, the court believed Klein's testimony that Weisman had given her the Oscar and found that Klein and Badax contributed the statuette's "hammer price" of $717,952 toward the purchase of the residence. And as noted, we defer to the court's credibility

16

determinations. (E.g., *McPherson*, *supra*, 47 Cal.App.5th at p. 257.)

### 2.3.3. DAX paid for substantial improvements to the residence.

The residence was not complete when Klein and Weisman purchased it. Over the course of several months in early 2012, the couple made improvements to the residence and Klein estimated that they spent at least $300,000 doing so. She also acknowledged that the Weisman entities paid for all, or nearly all, of the improvements.

Klein represented that she had also paid for "tens of thousands of dollars" for improvements to the residence, but no supporting evidence was ever introduced and the evidence admitted did not support her testimony.

Klein also claimed that DAX made the payments to vendors and other third parties in part to "build out" Weisman's office space, as he would have done in a commercial building. And she suggested that some of the improvements were in lieu of rent owed to Badax from Weisman, who intended to use a portion of the home as his office space. Although no written lease existed, Klein said that she and Weisman had agreed that he and his companies would fund some of the larger improvements to the residence.

The court rejected Klein's explanations because it found her testimony was "not believable and does not make sense." Specifically, the court noted that payments Klein urged were made in lieu of rent did not correspond to the period Weisman maintained his office in the residence. The court's credibility assessment and evaluation of the weight of the evidence are fully supported by the record.

### 2.3.4. DAX paid all the interest on Badax's mortgage loan.

In late December 2011, Klein, as the managing member of Badax, signed a mortgage loan agreement and promissory note with Lone Oak Fund, LLC (Lone Oak). Badax borrowed $895,000 at an interest rate of 7.9 percent and the loan was to be repaid in one year, on or before December 31, 2012.

Interest on the loan was payable monthly, beginning in February 2012. DAX made all the interest payments (a total of $66,776.91) and paid Lone Oak directly by automatic electronic funds transfers. Klein explained that these monthly payments were made by DAX in lieu of rent; Weisman intended to use a portion of the house as an office for his business endeavors. Again, and as explained in the prior section, the court rejected Klein's explanations because it found her testimony was "not believable and does not make sense." Specifically, the court noted that the payments Klein urged were made in lieu of rent did not correspond to the period Weisman maintained his office in the residence. The court's credibility assessment and evaluation of the weight of the evidence are fully supported by the record.

### 2.3.5. Davro gave Badax the funds used to pay off the mortgage loan.

On December 18, 2012, shortly before the deadline to pay the mortgage principal, a representative of Lone Oak advised Klein and Weisman via email that the loan payoff amount, including interest and fees, was $898,796.65. Less than 30 minutes after that email was sent, Badax received a wire transfer in the amount of $895,000 from an account belonging to Davro. The next day, a withdrawal was made from Badax's account in

the amount of $898,806.65. The loan principal was paid to Lone Oak on December 19, 2012.

Klein testified that the $895,000 transfer from Davro to Badax in December 2012 was a repayment of two loans Badax purportedly made to DAX in May and June of 2011. Badax's bank records, however, showed no evidence of the loans. A $750,000 transfer was made to DAX in May 2011, however, from an account bearing both Klein's and Weisman's name.[4] Klein produced a promissory note evidencing the loan and handwritten notations suggesting the loan had been repaid. But the $750,000 transfer occurred just 11 days after Weisman deposited $900,000 into the same account. Klein claimed the $900,000 deposit was a wedding gift and she recounted an elaborate and romantic gesture by Weisman. Further, Klein stated, Weisman asked to borrow $750,000 from her shortly thereafter and she agreed. Klein said she loaned Weisman another $100,000 a few weeks later.

The court rejected Klein's explanation as not credible and found it more likely that Weisman deposited $900,000 (presumably looted from Delta Aliraq) into the checking account and later withdrew $850,000 for some other purpose and that Weisman and Klein fabricated the promissory note and the other evidence of the wedding gift from Weisman. We will not disturb the court's credibility assessment. (*McPherson*, *supra*, 47 Cal.App.5th at p. 257.)

---

[4] Klein testified that, by agreement, the checking account was hers and was not a joint account with Weisman.

19

### 3.    The court properly denied the motion for new trial.

Finally, Badax contends the court erred in denying its motion for new trial due to irregularity in the proceedings, namely, misconduct by counsel for ULRS.[5] We disagree.

A new trial may be granted where there is an "[i]rregularity in the proceedings." (Code Civ. Proc., § 657, subd. (1).) "An 'irregularity in the proceedings' is a catchall phrase referring to any act that (1) violates the right of a party to a fair trial and (2) which a party 'cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits.' (*Gay v. Torrance* (1904) 145 Cal. 144, 149; accord, *Gibbons v. Los Angeles Biltmore Hotel* (1963) 217 Cal.App.2d 782, 791.)" (*Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1229–1230.) Our Supreme Court has concluded attorney misconduct qualifies as such an irregularity and, thus, may be grounds for a new trial. (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 870 (*Decker*).)

Badax contends counsel for ULRS committed misconduct by repeatedly referring to facts not in evidence, i.e., that Weisman had been seen with Klein in the courthouse during the trial and that, not coincidentally, Klein later offered documentary evidence (DAX's 2009 tax return) not disclosed during discovery. The tax return reflected a $989,000 capital gain from sale of land and was offered to support Klein's testimony that Weisman

---

[5] An order denying a motion for new trial is not appealable. (*Rodriguez v. Barnett* (1959) 52 Cal.2d 154, 156.) Such an order, however, may be reviewed on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.)

promised to, and did, give Klein $1 million as a wedding gift and she later used those funds to pay the $865,000 mortgage principal. No evidence was admitted concerning Weisman's supposed visit to the courthouse to collaborate with Klein, however. Nevertheless, counsel alluded to Weisman's supposed presence in the courthouse in ULRS's closing brief and in a subsequent brief regarding the form of judgment.

The trial court found that counsel committed misconduct by referencing Weisman's purported presence in the courthouse without any supporting evidence. We agree. An attorney has wide latitude to discuss the case during closing argument and may argue all reasonable inferences from the evidence. (See, e.g., *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795–796 (*Cassim*).) But it is well settled that an attorney who exceeds this wide latitude commits misconduct. For example, our Supreme Court has noted that " '[w]hile a counsel in summing up may indulge in all fair arguments in favor of his client's case, he may not assume facts not in evidence or invite the jury to speculate as to unsupported inferences.' (*Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747.)" (*Id.* at p. 796.)

But as the trial court noted, it is not enough for a party seeking a new trial to show attorney misconduct. The party must also demonstrate that the misconduct was prejudicial. (*Cassim, supra*, 33 Cal.4th at p. 800.) As to this issue, we make "an independent determination as to whether the error was prejudicial." (*Decker, supra*, 18 Cal.3d at p. 872.) Prejudice exists if it is reasonably probable that the trier of fact would have arrived at a verdict more favorable to the moving party in the absence of the irregularity or error. (*Cassim*, at p. 800.)

21

The prejudice analysis in a jury trial necessarily focuses on the state of the evidence and any conduct by the jury from which it might be inferred that the misconduct at issue did or did not affect the verdict. But here, the case was tried before a judge, not a jury, and we have the benefit of the court's analysis on the issue of prejudice.

The court directly addressed the issue at the hearing on the motion for new trial. Referencing Weisman's purported presence at the courthouse, the court explicitly stated it did not and would not consider that evidence, emphasizing the "overwhelming evidence" supporting the court's factual findings. After allowing counsel to argue, the court announced "that it was misconduct to refer to the evidence not admitted during the trial both in the closing brief and in the form of the brief and hearing." Then, the court noted that the evidence developed at trial amply supported the inference that Weisman and Klein colluded in order to deceive Weisman's creditors. In other words, the suggestion that Weisman colluded with Klein was not new and was supported by other admitted evidence. And, in any event, the court rejected that suggestion because it concluded "Klein acted without actual fraudulent intent, she did not wrongfully collude with Weisman and did not actively participate in his fraudulent schemes."

Moreover, the court explicitly rejected the possibility that counsel's misconduct affected the outcome of the case, stating:

"So I do think that pressing that point both at the statement of decision point of our proceedings and in the judgment proceedings was not appropriate. But, so what. Where is the evidence that the result would have been different absent the misconduct[…] that Ms. Klein and Badax [were] prejudiced by the statements? In my view, there is none. … I would not have

changed one iota of my decision, which I can say[.] A jury might not be able to say, but I can say, based if nothing [*sic*] was said about Mr. Weisman being in the hallway or Mr. Weisman providing the 2009 tax return. This was not a jury trial where we may not know what the jury considered. Here the decision and judgment I can absolutely, confidently, say was not influenced by misconduct of counsel in the least. The decision would have been exactly the same in the absence of misconduct. I just do not find any prejudice or any likelihood that the result would be different."

The court's clear statements notwithstanding, Badax seems to contend that counsel's misconduct was prejudicial. But its discussion on this point is simply a regurgitation of the evidence favorable to Badax and Klein that was presented at trial—evidence which the court rejected mainly on the basis of credibility. We will not disturb the court's ruling in this regard. (See, e.g., *Warren v. Merrill* (2006) 143 Cal.App.4th 96, 109 [" ' "[T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the [trier of fact]." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429.)' "].)

In sum, we take the court at its word and conclude counsel's misconduct was not prejudicial.

## DISPOSITION

The judgment is affirmed. ULRS, Inc. shall recover its costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, Acting P. J.

WE CONCUR:


EGERTON, J.


HILL, J.*

---

* Judge of the Santa Barbara Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.